UNITED STATES of America, Plaintiff–Appellee,

v.

Robert HAMMEN, Defendant–Appellant.

No. 91–3900.

United States Court of Appeals, Seventh Circuit.

Argued May 20, 1992.

Decided Oct. 13, 1992.

**380**

Steven M. Biskupic, Asst. U.S. Atty., Milwaukee, Wis., argued, for plaintiff-appellee.

William H. Theis, Chicago, Ill., argued, for defendant-appellant.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and GIBSON, Senior Circuit Judge.[1]

FLOYD R. GIBSON, Senior Circuit Judge.

Robert Hammen appeals his conviction for executing a scheme to defraud the University National Bank in violation of 18 U.S.C. § 1344 (1988). We affirm.

## I. BACKGROUND

Hammen was hired by the bank's president, Philip Hudson, in 1982 or 1983 and served as the bank's loan officer and vice-president. Although the president and one other person were authorized to initiate and process loans, most loans were initiated and processed by Hammen.

As the bank's vice-president, Hammen had authority to approve unsecured loans up to $25,000 and secured loans up to $50,000. Unsecured loans between $25,000 and $50,000 and secured loans between $50,000 and $100,000 had to be approved by the president. Loans for amounts higher than the president's limits had to be approved by the bank's loan committee.

Prior to the time Hammen became a loan officer at the bank, University National had problems obtaining repayment on some loans made to Victor Detoro. The problems became so bad that Hudson barred Detoro from conducting any business at the bank. The bank's problems with Detoro and Hudson's solution to those problems were known to Hammen.

1. The Honorable Floyd R. Gibson, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

Some time in 1987, Detoro desired to purchase a bar in Milwaukee. The contract for sale required Detoro to make a $25,000 down payment before the October 5 closing date, but he lacked the funds to make this payment. Detoro approached Robert Schafer and asked him to apply for a $65,000 loan at University National and allow him (Detoro) to have $45,000 of the proceeds.

Schafer was in the business of purchasing homes, rehabilitating them, and selling them for a profit. In the first part of 1987 he encountered financial problems, which included his inability to pay utilities and other bills and culminated in the foreclosure of all his property. Schafer was not a stranger to either Hammen or Detoro; Detoro had previously introduced Schafer to Hammen, and on that occasion Schafer had taken out a $25,000 signature loan.

Schafer, still in need of money, agreed to Detoro's plan. The loan documents were prepared by Hammen before Schafer ever went to the bank. Hammen also prepared a memorandum about the loan that indicated Schafer intended to use the loan proceeds to purchase additional property. The memo did not state that most of the money was going to be paid to Detoro. Once the loan was approved, $23,000 was disbursed directly to the seller of the bar Detoro desired to purchase, $12,000 was disbursed directly to companies owned by Detoro, and $30,000 was disbursed to Schafer. All the disbursements were signed and approved by Hammen.

In December 1987, Schafer needed some money and approached Hammen. The two discussed the fact that the loan committee would have to approve the loan if Schafer's total loan balance, which was then $90,000, exceeded $100,000. Therefore, to insure he would evade the review committee's scrutiny, Schafer requested an $8,000 loan.[2]

Hammen prepared a loan commitment memorandum for this loan that indicated Schafer had an account at University National with an average balance of just over $6,000; in reality, Schafer's account was overdrawn at the time Hammen prepared the memo.

In 1988, Schafer was still encountering financial difficulty, but had an interest in purchasing a particular piece of property. As the closing date on this property approached, Schafer found he did not have the necessary funds to complete the transaction. To raise the needed money, Schafer first persuaded his father to borrow $99,000 from University National. He then persuaded Ramona Dulde and Tammy Maddente to borrow $20,000 and $25,000, respectively. Dulde and Maddente both signed their checks over to Zil, Inc., a corporation formed by Schafer. Hammen authorized these actions by signing the backs of the checks. Despite his knowledge that Schafer had effectively obtained these funds, Hammen did not indicate in any memoranda that these loan proceeds were all going to Schafer, and that repayment of the loans would depend upon Schafer's success.

In December 1988, Schafer approached Tim Laughlin and told him he needed some extra money to pay for taxes,[3] and asked Laughlin to take out a loan for him. Pursuant to this request, Laughlin signed a blank financial statement and a blank business note. Schafer filled out the financial statement with figures and information he knew to be false. The memorandum prepared by Hammen also falsely reflected that Laughlin was the "sole owner of K & L Heating." Hammen then approved a loan to Laughlin for $25,000 without ever seeing or conversing with Laughlin, and authorized the disbursement of the proceeds directly to Schafer's company.[4]

---

2. Pursuant to the limits on Hammen's lending authority, this loan should have been reviewed by the bank president because Schafer's total indebtedness to the bank exceeded $50,000. However, Hammen never presented this loan for the president's review.

3. Actually, Schafer needed the money to pay bills related to his business.

4. In a similar fashion, Schafer obtained the proceeds of a $25,000 loan that was nominally taken out by Donna Warichak.

Also in December, Schafer was attempting to convince Dulde to become his partner in another investment property. The amount of money involved in the deal concerned Dulde, and she refused to become involved. However, even without an application from Dulde, Hammen processed and obtained approval for a $275,000 loan in Dulde's name. Dulde, upon learning that a loan in her name was being processed, called Hammen and told him she wanted no part of the loan.

Thereafter, Schafer attempted to obtain loans for Zil, Inc. In conjunction with these efforts, he submitted a personal financial statement that overstated his assets and omitted several liabilities. Schafer eventually secured loans totalling almost $600,000, all of which were processed by Hammen. Throughout these dealings (beginning with the Detoro transaction), Hammen was aware of Schafer's prior financial difficulties because he regularly spoke to Schafer about his financial status. However, Hammen never informed the loan committee or the bank president of Schafer's prior financial difficulties.

Hammen was indicted on one count of aiding and abetting a scheme to defraud University National, to which he pleaded not guilty. Schafer was indicted on one count of bank fraud and, pursuant to his plea agreement, testified against Hammen. Hammen was found guilty and sentenced to fifteen months imprisonment and ordered to pay nearly $280,000 in restitution. Hammen appeals.

## II. DISCUSSION

### A. Duplicity in the Indictment

■ Hammen first contends the indictment was duplicitous; that is, it charged more than one offense within a single count. Hammen waived this argument by failing to raise it prior to trial, *United States v. Petitjean*, 883 F.2d 1341, 1344 (7th Cir.1989), therefore we review only for plain error. *United States v. Masat*, 896 F.2d 88, 91 & n. 1 (5th Cir.1990) (citing Fed.R.Crim.P. 52(b)).

■ 18 U.S.C. § 1344 provides as follows:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Hammen's challenge focuses on the number of times the scheme in this case was executed. The indictment charged that Schafer "and others knowingly executed and attempted to execute a scheme to defraud and obtain money by means of false and fraudulent pretenses from University National Bank." The indictment proceeded to describe, in general terms, the actions Schafer and Hammen had taken to further and aid the scheme, and specifically alleged that the scheme was executed when a "falsified Individual Financial Statement for Tim Laughlin" was submitted to the bank. Hammen's challenge to the indictment is, essentially, that the indictment's language is really "an allegation that there were multiple executions of the scheme." Appellant's Brief at 14.

Congress modeled this statute, 18 U.S.C. § 1344, on the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, and intended that it be construed broadly. *United States v. Solomonson*, 908 F.2d 358, 364 (8th Cir.1990). In effectuating Congress' desire for a broad construction, one court has reasoned that since "[u]nder the mail fraud statute each mailing in furtherance of the scheme constitutes a separate violation," and "[e]ach use of the wires under the wire fraud statute is a separate offense," each check written in a check kiting operation constitutes a separate execution, and hence a separate offense, under § 1344. *United States v. Poliak*, 823 F.2d 371, 372 (9th Cir.1987), *cert. denied*, 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988). Similarly, the Third Circuit has

held that each check deposited in a scheme similar to check kiting[5] constitutes a separate offense. *United States v. Schwartz*, 899 F.2d 243, 248 (3d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990). Thus, for each count of conviction, there must be an execution.[6]

However, the law does not require the converse: each execution need not give rise to a charge in the indictment. The indictment in this case sets forth the existence of a scheme and alleges the scheme was executed on at least one occasion. The allegations tending to demonstrate the existence of the scheme do appear to be allegations that, if worded and structured differently, might constitute additional executions. This is hardly surprising; the actions that tend to prove the existence of the scheme will often be the actions actually taken to execute the scheme. Nonetheless, we believe the government has carefully crafted the indictment to allege only one execution of an ongoing scheme that was executed numerous times. Because we do not believe there was any error that "probably changed the outcome of the trial or otherwise resulted in a miscarriage of justice," *United States v. Becker*, 965 F.2d 383, 387 (7th Cir.1992), we hold there was no plain error in the indictment.

### B. Sufficiency of the Evidence

■ Hammen's challenge to the sufficiency of the evidence primarily argues[7] that it is not fraudulent for a bank officer to approve a loan knowing that the recipient intends to lend the money to a third party. From this, he concludes there could not be a scheme to defraud University National. We do not agree with Hammen's characterization of the law, and the evidence presented in this case was sufficient to allow the jury to return a guilty verdict.

As stated above, § 1344 is to be construed broadly. Whether a scheme to defraud exists is determined by examining "whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community. The bank fraud statute condemns schemes designed to deceive in order to obtain something of value." *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir.1987). The evidence at trial supported the government's theory that Hammen needed to prevent the bank from closely examining Schafer's loan portfolio because he had allowed some of the proceeds from the $65,-000 loan to go to Detoro in violation of the bank's directives regarding Detoro. Unfortunately, Schafer's financial problems were mounting; in order to give him the capital necessary to stay in business and, hopefully, recover from these financial difficulties, Hammen approved the use of nominees to funnel loan proceeds to Schafer. However, he never informed the bank that repayment on these loans rested, primarily, on Schafer's success, nor did he inform the bank of Schafer's financial difficulties. He ap-

---

**5.** The defendant deposited two large checks written by third parties into his account, knowing there were insufficient funds in the third parties' accounts to cover them, then drew checks on his own account against these deposits. The court held that each of the deposits constituted an execution and, hence, an offense.

**6.** We do not read *United States v. Lemons*, 941 F.2d 309 (5th Cir.1991) as being to the contrary. There, the evidence demonstrated a scheme to obtain a certain fund of money totalling $212,-000. *Id.* at 312–13. The money was obtained in a series of transactions, and the defendant was charged with and found guilty of multiple violations of § 1344. *Id.* at 313. The Fifth Circuit reversed, reasoning that there was one scheme designed to obtain $212,000, and the movement of this sum of money, "although in several separate stages or acts, was only part of but one

performance, one completion, one execution of that scheme." *Id.* at 318.

**7.** Hammen also raises, as an independent argument, the claim that there was no evidence from which the jury could conclude that he concocted the lie indicating Laughlin was the sole owner of K & L Heating. However, the statement was in Hammen's writing, Laughlin testified that he never met or spoke with Hammen, Tr. at 125, and Schafer testified that he did not supply this "information" to Hammen. Tr. at 110. From these facts, the jury could infer that Hammen manufactured the statement in order to falsely present a better picture of Laughlin's financial status. More importantly, the statute does not require that the actual act that executes the scheme be fraudulent; it is the scheme that must be fraudulent. *See* part C.3, *infra*.

proved loans without meeting applicants, approved loans based on information he knew to be false, and approved one loan that had not even been applied for by the nominee. This scheme, which was designed to provide Schafer with a source of funds to enable him to finish rehabilitating the homes he purchased so he could sell them for a profit and repay the loans, was executed every time loan proceeds were provided to Schafer. One such execution of this scheme was the Laughlin loan; the circumstances surrounding this loan were fraudulent because it contained information Hammen knew to be false, because the proceeds were really going to Schafer, and because Hammen did not inform the bank of Schafer's true financial status. Clearly, based on this evidence, there was sufficient evidence to enable the jury to determine that there was a scheme to defraud and that Hammen aided and abetted that scheme.

Hammen supports his argument by analogizing to a series of cases construing 18 U.S.C. § 656 (1988).[8] Relying primarily on *United States v. Gens*, 493 F.2d 216 (1st Cir.1974), he argues that loaning money to a nominee is not considered a misapplication of funds under § 656; therefore, it should not be considered fraudulent activity in violation of § 1344. The portion of *Gens* that is most helpful to Hammen states as follows:

> [W]here the named debtor is both financially capable and fully understands that it is his responsibility to repay, a loan to him cannot—absent other circumstances—properly be characterized as sham or dummy, even if bank officials know he will turn over the proceeds to a third party. Instead, what we really have in such a situation are two loans: one from the bank to the named debtor, the other from the named debtor to the third party. The bank looks to the named debtor for repayment of its loan, while the named debtor looks to the third party for repayment of his loan.... In this situation, the bank official has simply granted a loan to a financially capa-

ble party, which is precisely what a bank official should do.

*Id.* at 222.

This circuit has endorsed the principle espoused in *Gens*. *See, e.g., United States v. Bruun*, 809 F.2d 397, 411 (7th Cir.1987). However, this circuit has never held that third-party loans are always legal; in fact, we have noted that *Gens* permits the practice unless other circumstances are present. *United States v. Bailey*, 859 F.2d 1265, 1281 (7th Cir.1988), *cert. denied sub. nom., Ticktin v. United States*, 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989). In other words, "[i]f all the facts and circumstances surrounding a particular loan indicate that a bank officer intended to defraud or injure the bank, then the jury may properly find that the loan was a criminal misapplication despite the named borrower's willingness and ability to repay it. The intent to defraud or injure the bank is what separates criminal misapplication from mere maladministration." *Id.*

Here, the record is replete with additional circumstances that deny the exonerating effect of *Gens*. Hammen allowed funds to go to an individual he knew the bank desired to have no involvement with and falsified and suppressed information on loan applications. The jury was justified in finding Hammen's activities were intended to cause the bank to loan money based on inaccurate information, which is a form of fraud sufficient to justify the guilty verdict.

## C. Jury Instructions

Hammen raises three challenges to the jury instructions: 1) they did not include an instruction based on *Gens;* 2) they improperly made reference to 18 U.S.C. § 1346 (1988); and 3) they did not specify that the Laughlin loan was the alleged execution. Inasmuch as Hammen did not raise these objections at trial, we review the instructions for plain error. *Becker*, 965 F.2d at 387.

---

**8.** Section 656 prohibits, in pertinent part, bank employees from embezzling or willfully misap- plying any of the moneys or assets of a federally insured financial institution.

### 1. *Gens* Instruction

 Our discussion in part B, above, provides a ready answer to this claim. Given the evidence in the record, we do not believe the inclusion of this instruction would have changed the outcome of the trial. *See id.*

### 2. 18 U.S.C. § 1346

 18 U.S.C. § 1346 (1988) provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." The scheme allegedly took place between October 1987 and December 1989, but § 1346 did not go into effect until November 1988 and therefore was not in effect for the entire duration of the scheme. We hold there is no plain error for two reasons. First, the jury was presented a variety of theories to demonstrate the scheme's fraudulent nature, including Hammen's falsification and suppression of information. The proof on these points was sufficient to justify the jury's verdict, and the exclusion of the instruction about honest services would not have changed the verdict. Second, we are not convinced the instruction was improper. The government selected one of the many executions of this scheme—the Laughlin loan—that took place after § 1346 went into effect, thereby demonstrating that the scheme was still alive and in place after § 1346 criminalized actions that deprived University National of Hammen's honest services. Thus, we cannot conclude the instruction was erroneous.

### 3. Execution

 Finally, Hammen complains the jury instructions did not specify the Laughlin loan constituted the execution. Thus, the jury may have considered some other loan to be the execution of the scheme and, at the same time, considered the alleged deprivation of honest services. The harm from this is that the jury should not have considered the deprivation of honest services with any possible execution that occurred prior to the effective date of § 1346.

As noted in part C.2 above, the government's selection of the Laughlin loan (as opposed to any other loan) as the execution permitted the jury to be instructed about § 1346. Given the significance of this selection, the jury should have been instructed that it had to find the Laughlin loan was an execution of the scheme. As noted above, no such instruction was given; however, it is obvious the Laughlin loan was one of the many executions of the fraudulent scheme and the district court's failure to deliver such an instruction was not plain error.

### III. CONCLUSION

We conclude there was no plain error in either the indictment or the jury instructions. We further conclude there was sufficient evidence to support Hammen's conviction. We therefore affirm the district court.

AFFIRMED.