United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 11, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-11030
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

versus

JOSEPH R. KIRKHAM; JAMES MARK MURPHY,

                                        Defendants-Appellants.

--------------------
Appeal from the United States District Court
for the Northern District of Texas
(4:02-CR-011-Y(03))
--------------------

Before REAVLEY, WIENER, and BENAVIDES, Circuit Judges.

WIENER, Circuit Judge:[*]

    Defendant-appellants James Murphy, M.D., and Joseph Kirkham (collectively, "defendants") appeal their respective criminal convictions for health care fraud under 18 U.S.C. §§ 1347 and 2. They raised numerous challenges to their convictions and sentences, several of which are grounded on their argument that the government improperly indicted them by including only one count in its indictment while listing several other discrete executions of defendants' alleged scheme to commit health care fraud as examples rather than as separate counts. Although we conclude that the

_____

    [*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

government's indictment was flawed — specifically, duplicitous — we hold that, because defendants experienced no prejudice as a result of the duplicitous indictment or of any trial errors that they asserted, their convictions should be affirmed. As for their sentences, however, the Supreme Court's recent decision in <u>United States v. Booker</u>[2] requires us to hold that defendants' Sixth Amendment rights were violated by the district court's calculation of loss and concomitant sentencing under the then-binding United States Sentencing Guidelines. We therefore vacate defendants' sentences and remand for re-sentencing.

## I. FACTS AND PROCEEDINGS

In May 2003, a jury convicted Kirkham and Murphy of health care fraud, in violation of 18 U.S.C. §§ 1347[3] and 2.[4] The three-page indictment charged each defendant with only one count, alleging that they had executed and attempted to execute a scheme to defraud various health care benefit plans from August 1996

---

[2] 125 S.Ct. 738 (2005).

[3] Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice--
   (1) to defraud any health care benefit program . . .
in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. . .

[4] (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
   (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

through the year 2000.  In October 2003, the district court sentenced Kirkham to 120 months of imprisonment and ordered him to pay restitution of $2,751,270.  Murphy was sentenced to 87 months of imprisonment and ordered to pay restitution of $732,061.

A. The Indictment

The government indicted Kirkham, Murphy, and Alvin Lostetter, M.D., on one count of executing or attempting to execute a scheme to commit fraud on health care benefit programs.[5]  Part A of the indictment states the duration of the scheme, August 1996 – 2000, its location, the defendants' names, and the identities of several health care benefit providers that defendants were charged with defrauding.  It goes on to describe the scheme as an effort to "obtain by means of false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of health care benefit programs in connection with the delivery of and payment for health care benefits, items, and services."

Part B of the indictment describes defendants' scheme in greater detail.  It lists seven components of the scheme, including creating phony medical business entities and names, billing under the names of doctors who did not provide or supervise medical services, recruiting patients with false representations, providing false medical diagnoses, and using chiropractors and unlicensed

---

[5]  Although he was indicted with Kirkham and Murphy, Lostetter did not go to trial with them.

3

personnel to recruit "patients" and render medical diagnoses and treatment consistent with the scheme and the amount of health insurance carried by the patient, rather than according to the true medical needs of the patient. Part B also states that the health care benefit programs provided payments to defendants based on the submission of false claims and diagnoses, and that defendants received and shared these proceeds pursuant to their scheme.

Part C of the indictment lists 13 particular transactions executed or attempted to be executed in perpetrating the scheme to defraud. Each transaction listed included the date of the billing, the name of the medical insurance provider, the doctor's name under which services were billed, and the name(s) of the patient(s). Four of these transactions named Lostetter as the physician providing services, one transaction named Kirkham and Lostetter as physician providers, and eight transactions named Murphy. All 13 listed transactions took place after August 1996. The indictment does not specify which of the individually listed transactions would be used at trial to illustrate defendants' execution of the scheme.

B. Health Care Clinic and Gym Scheme

The government asserted at trial that, beginning in 1993, Kirkham, along with several other individuals, conducted a continuing scheme to defraud health care benefit programs through their operation of health care clinics associated with gyms and

4

health clubs; Murphy joined Kirkham in operating the scheme in 1997. Kirkham and Mark Darner, a chiropractor, operated the scheme along with Murphy and other medical doctors, including Lostetter and Victor McCall. Darner pleaded guilty to conspiracy to commit mail fraud and testified about the health care fraud scheme at Kirkham and Murphy's trial.

Darner testified that he and Kirkham set up health care clinics inside a number of health clubs of which they were majority owners, and that they used the club sites to solicit and direct new patients to the clinics. Murphy's, Lostetter's, and McCall's names were often used in billing insurers, said Darner, explaining that insurers are more likely to reimburse and to pay a higher rate for invoices submitted by doctors than those from chiropractors. According to Darner, Kirkham was the CEO and principal operator of the health clubs. He directed Darner regarding implementation of the scheme.

Defendants implemented a standing procedure that required each new fitness club member to be examined in the clinic. While Murphy was associated with the clinics in 1997 and 1998, they employed a written treatment protocol authored by Kirkham, Murphy, and Darner. This protocol specified listed treatments to be given to each new "patient" or gym member at the five or six clinics being operated at the time, with explicit instructions not to modify treatment unless it was contraindicated. Clients were assigned treatment classifications based on their insurance

5

coverage.  For the first visit of a member/client who had insurance, the protocol required a new patient exam, range of motion analysis, scanning EMG, thermography, and radiographs regardless whether tests and these treatments were indicated as required by the patient.  The second automatic visit protocol called for more extensive tests and treatment, including billing for a number of other diagnostic tests.

Testifying at Kirkham and Murphy's trial were (1) Darner, (2) Victor McCall, another physician who participated in the scheme, and (3) Charles Stafford, a staff chiropractor, as well as several clinic "patients," a medical transcriber, and an expert witness. The witnesses who had participated in the scheme with defendants described the nature of the scheme in detail, including the process used for submitting the fraudulent claims.  The clinic's clients testified that, after joining the health club for fitness reasons, they were told to go to the clinic for unwanted and unnecessary medical exams.  Several clients identified false listings of symptoms and diagnoses in their files and confirmed that claims sent to their insurance companies were false.

The government also presented an expert witness, Charles Crane, M.D., who testified that defendants' billing and testing procedures were inappropriate and fraudulent.  Eeletha Williams, a medical transcriber who worked for Murphy from 1995 to 1999 testified that most of Murphy's patient reports contained a note stating that the billing had been dictated but not read by Murphy,

6

even though Murphy had not dictated, reviewed, or provided any information for the reports. She also stated that Murphy told her on several occasions that the reports were too short and asked her to generate more lengthy patient reports containing false information.

C. Oxylab

Oxylab was another company of which Murphy was medical director. Karen Musch, an employee of Oxylab, pleaded guilty to mail fraud and testified against Murphy. Musch testified that she served as medical director of a fraudulent sleep apnea study conducted by Oxy-Lab, and that Murphy participated in the study during the time that he was active in the health club scheme with Kirkham. Musch stated that Murphy never performed or read any sleep apnea tests, yet he submitted insurance claims purporting to bill providers for his services related to the study. Several insurance billings listed in Part C of the indictment were claims processed and paid by health care benefit programs for this sleep apnea study.

## II. ANALYSIS

A. Sufficiency of the Evidence

   1. Standard of Review

We review challenges to sufficiency of the evidence by examining whether, in the light most favorable to the government, a rational jury could have found the essential elements of an

offense to be established beyond a reasonable doubt.[6]

2.   The Evidence

Defendants' challenge to the sufficiency of the evidence rests, in large part, on their assertion that the government's one-count indictment against them was flawed.   They contend that, according to our decision in United States v. Hickman, when charging defendants with violations of the health care fraud statute, 18 U.S.C. § 1347 ("§ 1347"), the government is required to charge each execution of their fraudulent scheme in a separate count.[7]   In this case, the government included a list of "executions" in the one-count indictment but did not single out any specific acts on which the jury must have agreed to convict. Defendants contend that this is contrary to Hickman and, because of this defect in the indictment, the evidence was insufficient to support their convictions.   They insist that the government was required to (1) list each execution of the scheme separately and (2) prove the commission of each execution listed in the indictment.

In addition to their Hickman argument, defendants assert that their indictment was duplicitous, i.e., that it charged in a single

_____

[6] United States v. Solis, 299 F.3d 420, 445 (5th Cir. 2002).

[7] See 331 F.3d 439, 446 (5th Cir. 2003), on remand at 282 F. Supp. 2d 528 (S.D. Tex. 2003), affirmed by 374 F.3d 275 (5th Cir. 2004), vacated and remanded for re-sentencing in accordance with United States v. Booker, 125 S.Ct. 738 (2005), 125 S.Ct. 1043 (2005).

8

count that which could have been charged in separate counts.[8] Finally, defendants argue that, because several of the transactions enumerated in Part C list Victor Lostetter as the physician who provided the treatment, and the government did not produce evidence to prove that these transactions were fraudulent, the government did not meet its burden of proof with respect to these transactions.  We address defendants' challenge to their indictment in some detail, as it reappears several times, underlying many of the other challenges to their convictions and to their sentences.[9]

First, defendants are mistaken in their assertion that <u>Hickman</u> requires the government to charge health care fraud defendants for each separate execution of their scheme to defraud health care benefit providers.  In <u>Hickman</u>, we held that the health care fraud statute, like the bank fraud statute,[10] criminalized <u>executions</u> of schemes to defraud, in contrast to the mail and wire fraud statutes, which permit the government to charge a defendant for each <u>act in furtherance</u> of a scheme to defraud.[11]  We did <u>not</u> hold that the government <u>must</u> charge defendants with each separate

---

[8] <u>See</u> <u>United States v. Baytank</u>, 934 F.2d 599, 609 (5th Cir. 1991).

[9] The defendants do not directly challenge the indictment itself on appeal but argue only that, because the indictment was duplicitous, this error contributed to other trial errors.

[10] 18 U.S.C. § 1344.

[11] 331 F.3d at 446 (citing <u>United States v. Lemons</u>, 941 F.2d 309 (5th Cir. 1991) for this interpretation of the bank fraud statute).

execution of § 1347, stating instead that, as a health care fraud may be executed several times, the government <u>could</u> charge each execution in a separate count.[12]  In essence, we sought to clarify that the government may not indict defendants for violations of § 1347 without charging that they <u>fully executed</u> a scheme, as distinguished from only committing overt acts <u>in furtherance of</u> its execution.

Other circuits have encountered similar challenges to single-count indictments brought under the bank fraud statute and have agreed that, although the government may charge defendants for each execution of the scheme, it is not required to do so.[13]  The Seventh Circuit's reasoning, endorsed by the Ninth and D.C. Circuits, explained that:

> [F]or each count of conviction, there must be an execution.  However, the law does not require the converse: each execution need not give rise to a charge in the indictment.  The indictment in this case sets forth the existence of the scheme and alleges the scheme was executed on at least one occasion.  The allegations tending to demonstrate the existence of

---

[12] 331 F.3d at 446 ("Of course, although the crime of health care fraud is complete upon the execution of a scheme, any scheme can be executed a number of times, and each execution <u>may</u> be charged as a separate count.")(emphasis added).

[13] <u>United States v. King</u>, 200 F.3d 1207, 1212-13 (9th Cir. 1999)(rejecting a defendant's due process and double jeopardy challenges to a one-count indictment); <u>United States v. Bruce</u>, 89 F.3d 886, 889-90 (D.C. Cir. 1996)(holding that the government need not indict a defendant on every execution of a bank fraud scheme); <u>United States v. Hammen</u>, 977 F.2d 379, 383-84 (7th Cir. 1992)(upholding a one-count indictment despite allegations in the indictment that could, if worded and structured differently, be chargeable as individual counts).

10

the scheme do appear to be allegations that, if worded and structured differently, might constitute additional executions. This is hardly surprising; the actions that tend to prove the existence of the scheme will often be the actions actually taken to execute the scheme.[14]

Each court also emphasized, however, that to avoid duplicity, the government must carefully craft its indictment to include only one execution of a scheme in a count.[15]

As the government was not required to charge Kirkham and Murphy with each execution of the scheme, but instead could indict them for the scheme by charging only one execution, we must determine whether the government carefully crafted its indictment to charge only one execution, and thereby avoid a duplicitous indictment. We begin by defining "executions" of a scheme to determine whether more than one is charged in a single-count.

In Hickman, we described an "execution" under § 1347 in the same manner as an execution of § 1344, the bank fraud statute, viz., that transactions with a common purpose but involving separate and independent obligations to be truthful may constitute separate executions.[16] The process of defining "execution of a scheme" is a fact-intensive one in which we consider such factors

---

[14] Hammen, 977 F.2d at 383; see also King, 200 F.3d at 1213; Bruce, 89 F.3d at 889-90.

[15] See King, 200 F.3d at 1213; Bruce, 89 F.3d at 890; Hammen, 977 F.2d at 384.

[16] Id., citing United States v. De La Mata, 266 F.3d 1275, 1287 (11th Cir. 2001).

11

as (1) the ultimate goal of the scheme, (2) the nature of the scheme, (3) the benefits intended, (4) the interdependence of the acts, and (5) the number of parties involved.[17]

In Hickman, the defendant was accused of billing Medicare, Medicaid, and a variety of private insurance companies in a series of fraudulent transactions.[18] Applying the foregoing factors and other prior interpretations of § 1344 (the bank fraud statute) to § 1347, we held the fourth factor, interdependence, to be dispositive.[19] The defendant submitted each claim separately and, with each submission, owed a new and independent obligation to be truthful to the insurer.[20] Therefore, each claim submission was a separate execution of the scheme.[21]

The government indicted Kirkham and Murphy for virtually the same conduct —— submitting false claims to a variety of health insurers —— as that for which it had prosecuted the Hickman

---

[17] Id., citing De La Mata, 266 F.3d at 1288 (citations omitted).

[18] Id. at 441.

[19] Id. We concluded that the other four factors were unhelpful: The nature of the scheme was to submit false claims to health insurers; the benefit was the money rendered by the insurer to the defendant; financial gain was the ultimate goal; and the defendant defrauded several parties, although she primarily targeted Medicare and Medicaid. Id. at 446-47. These factors are identical in the instant case, except that Kirkham and Murphy targeted a wider variety of health care benefit providers than had Hickman.

[20] Id.

[21] Id.

12

defendant.  As in <u>Hickman</u>, these defendants submitted numerous false claims to a variety of health insurers which were not interdependent, with financial gain as defendants' ultimate goal. We conclude that, as in <u>Hickman</u>, each false claim submitted to an insurer constituted an execution of Kirkham and Murphy's scheme.[22] The indictment itself appears so to define the listed claims, as it states that "[i]n execution and attempting to execute the scheme. . . medical claims were submitted and caused to be submitted by the defendants. . ." before listing in Part C the separate claims submitted by defendants.  We are satisfied that Part C of the indictment did charge defendants in one count with several executions of their scheme when it listed 13 false claims submitted without specifying which of these claims would be used at trial to demonstrate that defendants executed their scheme.

Section 1347 does not criminalize the scheme alone ── the government must prove at least one execution of the scheme, and the indictment should specify which execution of the scheme will be used.[23]  The indictment brought against Kirkham and Murphy lists 13 allegedly fraudulent claims without singling out one particular

---

[22] Ordinarily, the process of defining a scheme under the health care fraud, or the bank fraud, statute, would be more laborious.  In this case, the facts are so similar to the facts set forth in <u>Hickman</u> that we see no need to re-hash an explanation of why the defendants' conduct constituted executions of the scheme in greater detail.  <u>See</u> 331 F.3d at 446-47.

[23] <u>See</u> <u>Hammen</u>, 977 F.2d at 383.

claim as the one for which liability will be imposed.[24]  Had the indictment listed several transactions as examples of executions of the schemes but had also been "carefully crafted" to identify one specific transaction that constituted execution of the scheme and on which the jury must agree before convicting defendants, the indictment would not have been duplicitous; however, it did not do so.[25]

Despite this flaw in the indictment, though, the government adduced trial evidence sufficient to sustain defendants' convictions.  With respect to Murphy, in addition to evidence of the broader fraudulent scheme, two of the patients listed in Part C as "treated" by Murphy, Joyner and Hancock, testified at trial as did Stafford, the chiropractor involved with their treatment.  All three confirmed that Murphy's billings for services ostensibly provided by him to these patients were fraudulent.  As for the six patients listed in Part C as receiving sleep apnea services billed by Murphy as part of the OxyLab study, the government also produced ample evidence of fraud.  The patients' testing and Medicare claim records were introduced into evidence, and the director of OxyLab

---

[24] See Bruce, 89 F.3d at 890 (holding valid a one-count bank fraud indictment listing acts taken in furtherance of the scheme but that could have been charged separately as executions, because the indictment specified one fraudulent transaction taken "for the purpose of executing. . .").

[25] See id.; Hammen, 977 F.2d at 383 (upholding one-count indictment and noting that "the government has carefully crafted the indictment to allege only one execution of an ongoing scheme that was executed numerous times.").

testing, Karen Musch, testified as to Murphy's negligible involvement in the study and in services for which fraudulent claims were submitted to insurers. The government produced sufficient evidence to support the jury's verdict on every one of the executions listed in Part C of the indictment as being submitted by Murphy.

Substantial evidence also supported Kirkham's conviction for his role in this health care clinic scheme. Darner testified that he and Kirkham originally set up the scheme and handled all billing themselves. Darner also testified that he, Kirkham, and Murphy conspired to commit health care fraud by fraudulently billing insurance companies, and that Kirkham was the "main boss" of the operation. And, McCall, a medical doctor, testified that he participated in the scam with Kirkham and Darner after Murphy had left the clinic. Even though the government included only one execution of the scheme in which Kirkham was listed as the medical provider and did not produce the named patient as a witness at trial, the overwhelming evidence of Kirkham's involvement with the scheme and significant participation in the billing procedures support a finding that he worked with Murphy to execute the scheme on the other listed occasions.

The government need not prove all facts alleged in the indictment as long as it proves the essential elements of the

15

crime.[26]  In this case, the government was required to show that the defendants:  (1) knowingly and willfully (2) executed or attempted to execute (3) a scheme or artifice (4) to defraud any health care benefit program (5) in connection with the delivery of or payment for health care benefits, items, or services[27]; or that they (a) aided, abetted, counseled, commanded, induced or procured such an offense or (b) willfully caused an act to be done which, if it had been directly performed by the defendant, would have constituted such an offense.[28]  Even if we assume that the government did not adduce adequate evidence to support conviction for the claims listing Lostetter as the physician provider, it presented ample evidence to prove each element of the offense with respect to each defendant.[29]  For this reason we also reject defendants' argument that the government failed to meet its burden of proof with respect to fraudulent transactions listed in the indictment that identified

---

[26] United States v. Robinson, 974 F.2d 575, 578 (5th Cir. 1992).

[27] 18 U.S.C. § 1347(1).

[28] 18 U.S.C. § 2.

[29] See Griffin v. United States, 502 U.S. 46, 49, 58-59 (1991)(holding that, although petitioner was convicted of conspiracy despite the government's failure to present any evidence linking the petitioner to one of the two illegal objects of the conspiracy as stated in the indictment, this did not require reversal of the jury's verdict as there was evidentiary support for the other object.  Although reversal is appropriate where a jury's verdict may have rested on a legally inadequate basis, such is not the case when one possible basis of conviction was unsupported by sufficient evidence, as juries are perfectly well equipped to evaluate the evidence).

Lostetter as the treating physician.[30]

In sum, even though the indictment was flawed, making it somewhat more difficult to ascertain for which of the executions the jury convicted defendants, the government produced sufficient evidence to support the jury's finding that Murphy and Kirkham were each responsible for at least one listed execution of the scheme. We hold that the indictment's flaw did not affect defendants' substantial rights and that the evidence was sufficient to support the jury's verdict beyond a reasonable doubt.

B.    "Void for Vagueness" Statutory Challenge

1.    Standard of Review

We review challenges to the constitutionality of a statute de novo.[31]

2.    Vagueness

Defendants charge that, under the circumstances of this case, § 1347 is "void for vagueness." Their argument rests largely on claimed deficiencies in the jury instructions and in the indictment, which we discuss elsewhere in this opinion. Otherwise, defendants contend that, because the statute does not define "execution or attempt to execute" a health care fraud scheme, it did not adequately put them on notice that their conduct could be

---

[30] As we noted above, Lostetter was indicted with the defendants but was not tried with them.

[31] United States v. Monroe, 178 F.3d 304, 308 (5th Cir. 1999).

17

illegal.

The Supreme Court requires that Congress define criminal offenses with "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[32] Each vagueness challenge that does not involve First Amendment freedoms must be examined in light of its individual facts and circumstances.[33] A challenge that a statute is unconstitutional for vagueness is closely related to an objection that a statute does not require a showing of specific intent.[34] If a statute does include "willfulness" or specific intent as an element, it will normally not be so vague as to deprive a defendant of reasonable notice that his conduct is proscribed.[35] Accordingly, we have upheld the constitutionality, against vagueness challenges, of both

---

[32] Kolender v. Lawson, 461 U.S. 352, 357 (1983).

[33] United States v. Gray, 96 F.3d 769, 776 (5th Cir. 1996).

[34] United States v. Waymer, 55 F.3d 564, 568 (11th Cir. 1995)(holding that, as the bank fraud statute incorporates specific intent as an element, the defendant's vagueness challenge to the statute must fail).

[35] Screws v. United States, 325 U.S. 91, 102 (1945) ("But where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law. The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware.").

18

the bankruptcy fraud statute and former 18 U.S.C. § 1346, the general anti-fraud statute, because each requires the government to prove specific intent to defraud —— as does § 1347.[36]

Defendants do not contest that the jury was required to find that they acted with specific intent to defraud a health care benefit provider, or that the indictment adequately described the overall scheme to defraud health care benefit providers. Although the indictment itself may have been flawed, leaving defendants somewhat unsure which of the 13 listed executions of the scheme the government would attempt to prove at trial, neither the statute nor the indictment left defendants guessing at what conduct the government alleged was fraudulent, whom they defrauded, or how. Defendants' real objection appears to be the fact that the indictment did not separately charge each execution of their scheme to defraud health care benefit programs, which, as we observed above, it was not required to do. Defendants do not advance that they did not understand what it meant to execute the scheme to defraud and therefore could not have intentionally violated the statute. We hold that defendants' vagueness challenge to the constitutionality of the health care fraud statute fails.

C.   Motion for Bill of Particulars

1.   Standard of Review

---

[36] Id., United States v. Daniels, 247 F.3d 598, 600 (5th Cir. 2001). In Daniels, we concluded that there is nothing "inherently vague in the notion of a general anti-fraud statute." Id.

We review denial of a motion for a bill of particulars for abuse of discretion.[37]  Only defendant Murphy moved for a bill of particulars, however, so our review as to defendant Kirkham is for plain error.

2.    Bill of Particulars

The purpose of a bill of particulars is to apprise a defendant of the charges against him with enough detail to allow him to prepare his defense.[38]  A criminal defendant must demonstrate that he was actually surprised at trial, and thereby prejudiced in his substantial rights, before we will reverse a conviction based on a district court's denial of a motion for a bill of particulars.[39]

As we concluded above, the indictment returned against Kirkham and Murphy was duplicitous; nevertheless, it gave defendants adequate notice of the charges against them.  The language of the indictment clearly describes the essential elements of the crime and charges that defendants "knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud health care benefit programs. . ."  This tracks the language of § 1347, which

---

[37] United States v. Lavergne, 805 F.2d 517, 520 (5th Cir. 1986).

[38] United States v. Montemayor, 703 F.2d 109, 117 (5th Cir. 1983).

[39] Lavergne, 805 F.2d at 521 ("The fact that the indictments are only thus decipherable falls short of the precision desirable in an indictment. But a finding that no bill of particulars was needed also rests on the fact appellants have not made the requisite showing of surprise. . .").

20

states "whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice to defraud any health care benefit program,"[40] and makes clear which subsection of the statute defendants were being charged with violating. The indictment goes on to name six insurance companies that defendants allegedly defrauded, and, in seven paragraphs under Part B, the specific scheme or artifice by which defendants allegedly defrauded them. The time frame of the scheme, August 1996 through 2000, is also included. Part C of the indictment lists 13 allegedly fraudulent medical claims, including dates and the names of insurance providers, doctors, and patients, submitted by defendants in their execution of the scheme.[41] The government obviously provided enough information to the defendants to give them notice of the charges against them.

In any event, Murphy (and, for that matter, Kirkham) was neither surprised nor prejudiced at trial by the court's failure to grant his motion for a bill of particulars. The government provided both defendants with voluminous discovery, including the testimony and exhibits eventually introduced against them at

---

[40] 18 U.S.C. § 1347(1).

[41] Five of these claims listed Lostetter as the doctor who allegedly provided services to the patient; as noted infra, Lostetter was originally indicted along with Kirkham and Murphy but did not go to trial with them. Therefore, the government did not present evidence as to these transactions.

trial.[42]   Moreover, even if the indictment had not furnished adequate information about the charges brought against defendants, the government's providing them with the necessary information in another satisfactory form obviated the need for a bill of particulars.[43]  We are convinced that defendants were not actually taken by surprise at trial, so the trial court's denial of the bill of particulars did not prejudice them.[44]

D.   404(b) Challenge

    1.   Standard of Review

We review challenges to the admission of evidence for abuse of discretion.[45]

    2.   Extrinsic Evidence of Bad Acts

---

[42] See Lavergne, 805 F.2d at 521 (holding that defendants had not been surprised or prejudiced by facts used to support the government's case because the government had made the evidence used at trial available for inspection and copying by the defendants' attorneys or investigators).

[43] United States v. Vasquez, 867 F.2d 872, 874 (5th Cir. 1989).

[44] See United States v. Montemayor, 703 F.2d 109, 117 (5th Cir. 1983).

[45] United States v. Stouffer, 986 F.2d 916, 924 (5th Cir. 1993)(citing United States v. Liu, 960 F.2d 449, 452 (5th Cir. 1992).  Defendants made a 404(b) challenge only to the admission of the testimony of Lydia Roberts, a patient/client of the clinic; the trial court also admitted testimony of other patients and patient files not listed in the indictment, to which the defendants did not object.  Although review of this other evidence should rightfully be for plain error, as we hold that the court did not abuse its discretion with respect to admission of any of the evidence at issue here, it obviously did not commit plain error either.

Defendants challenge the trial court's admission of evidence of fraudulent transactions that were not specified in the indictment. They contend that these transactions constitute evidence of extrinsic bad acts, requiring the trial court to weigh the probative value of the evidence against unfair prejudice to the defendants as a result of its admission.[46] Defendants argue further that, as the government did not disclose its intention to introduce this evidence at trial pursuant to defendants' 404(b) motion to disclose, they did not receive fair notice that such evidence would be introduced against them at trial.

If the existence of a scheme to defraud is an element of the offense, then acts and transactions constituting a part of that continuing offense are admissible as proof of the criminal enterprise.[47] Evidence of an uncharged offense arising out of a scheme or artifice to defraud is not "extrinsic" within the meaning of 404(b) and thus not excludable on this ground.[48] The prosecution

---

[46] See United States v. Dula, 989 F.2d 772, 777 (5th Cir. 1993).

[47] See id. at 777-78.

[48] Id. See also Stouffer, 986 F.2d at 926 ("[E]vidence relevant to establish the existence of a criminal enterprise is not extrinsic to the crime charged."); United States v. Lokey, 945 F.2d 825, 834 (5th Cir. 1991)(holding evidence of similar crimes committed outside the temporal scope and substantive counts of the indictment admissible "because it was relevant to establish how the conspiracy came about, how it was structured, and how each appellant became a member"); United States v. Nichols, 750 F.2d 1260, 1264-64 (5th Cir. 1985)(holding evidence of defendant's involvement in uncharged crimes admissible as it was intrinsic to the government's case in proving the existence

23

may offer evidence of any surrounding circumstances that are relevant to prove intent or motive with respect to the fraudulent scheme.[49]

All the evidence challenged by Murphy and Kirkham concerned other transactions that tended to show the existence of the continuing scheme to defraud insurers. The evidence introduced by the government was undeniably relevant to proving defendants' intent or motive with respect to the fraudulent scheme. Most telling is the fact that defendants did receive fair notice of this evidence, as the government either produced or allowed defendants access to all of it well in advance of trial. The district court did not abuse its discretion in admitting this evidence.

E.    Jury Instructions

    1.    Standard of Review

Appellants did not challenge the jury instructions at trial or proffer any alternative instructions of their own. We therefore review their complaints about the instruction for plain error.[50]

_____

of a conspiracy).

[49] Id.

[50] United States v. Hickman, 331 F.3d 439, 443 (5th Cir. 2003), on remand at 282 F. Supp. 2d 528 (S.D. Tex. 2003), affirmed by 374 F.3d 275 (5th Cir. 2004), vacated and remanded for re-sentencing in accordance with United States v. Booker, 125 S.Ct. 738 (2005), 125 S.Ct. 1043 (2005). Defendants charge that to challenge the instructions would have been futile and refer us to United States v. Velarde-Gomez, 224 F.3d 1062, 1074 (9th Cir. 2000), in which the Ninth Circuit allowed a "pointless formality" exception to the requirement for formal objections to jury instructions. This decision was vacated by an en banc re-

## 2.    Contested Jury Instructions

Defendants contest the trial court's instruction to the jury that it was not necessary for the government to prove "all the details alleged in the indictment concerning the precise nature and purpose of the alleged scheme." They take issue as well with the court's instruction that "it must be proven beyond a reasonable doubt that the defendants knowingly devised or intended to devise a scheme substantially similar to that charged in the indictment and that they executed or attempted to execute the same." These instructions, defendants argue, may have caused them to be found guilty of uncharged conduct or may have resulted in a non-unanimous verdict.

The government responds first by pointing out that the instructions at issue required the jury to convict only for conduct charged in the indictment. It acknowledges, however, that the indictment charged multiple executions of a scheme in but a single count, and that this potentially posed a danger of a non-unanimous verdict. Conceding that a special unanimity instruction would have avoided this claimed problem with the indictment,[51] the government

---

hearing, 269 F.3d 1023 (9th Cir. 2001). The Ninth Circuit's rule, established by other cases, requires that a defendant offer an alternative instruction, which the defendants in this case do not claim to have done. See United States v. Kessi, 868 F.2d 1097, 1102 (9th Cir. 1989).

[51]    See United States v. Baytank, 934 F.2d 599, 609 (5th Cir. 1991) ("[T]he complaint comes down to whether the jury instructions were sufficient, as it is clear that this aspect of a duplicity problem can be cured by appropriate special

nevertheless contends that the court's general unanimity instruction ("Your verdict must be unanimous as to each defendant named in the indictment.") was sufficient. Citing our decision in United States v. Tucker, the government goes on to argue that, absent evidence to the contrary, a court has no reason to assume that a verdict is not unanimous.[52]

The government argues further that defendants have produced no evidence that they were prejudiced. The key issue at trial was whether defendants' business was a fraudulent scheme under § 1347. As there is no question that, if the business was fraudulent, defendants executed the fraud numerous times, argues the government, there is little danger that the jury convicted defendants non-unanimously.

Although the indictment was duplicitous and did create the potential risk of a non-unanimous verdict, the district court instructed the jury that it must find that defendants had executed or attempted to execute the fraudulent scheme. As we noted above in our discussion of defendants' challenge to the sufficiency of the evidence, there was ample evidence supporting the government's charges as to several of the executions of the scheme listed in the indictment, and there is no real danger that the jury did not agree

---

instructions which . . . inform the jury that it must unanimously agree on the specific basis . . . on which it finds the defendant guilty")(emphasis in original).

[52] 345 F.3d 320, 336 (5th Cir. 2003).

26

that defendants had executed the scheme.  Even if the district court might have erred in not giving a special unanimity instruction to cure the defect in the indictment, such omission did not prejudice defendants.[53]

F.    Ex Post Facto Conduct

1.    Standard of Review

Defendants did not raise this argument before the district court.  We therefore review it for plain error.[54]

2.    Conduct Predating the Statute of Conviction

Defendants argue that, by presenting evidence of their conduct that took place prior to the August 1996 effective date of § 1347, the government violated the Constitution's Ex Post Facto clause. In response the government emphasizes that (1) the indictment specified that the criminal scheme extended from August 1996 until 2000, (2) the only executions listed in the indictment took place after August 1996, and (3) the district court instructed the jury that it must find a scheme or plan to defraud "substantially the same as the one alleged in the indictment."  Although the government did adduce evidence relating to pre-enactment conduct,

---

[53] See, e.g., Baytank, 934 F.2d at 610 (holding no plain error where court did not give special unanimity instruction on single count, duplicitous indictment); United States v. Razo-Leora, 961 F.2d 1140, 1146-47 (5th Cir. 1992) (finding no plain error despite trial court's failure to give special unanimity instruction on duplicitous indictment).

[54] United States v. Richards, 204 F.3d 177, 197 n.6 (5th Cir. 2000).

this evidence demonstrated the existence of a continuing offense and, as it was not listed in the indictment, could not have been the conduct for which the jury convicted defendants.

A law violates the Ex Post Facto clause if it punishes acts that, when committed, were not criminal.[55]  In Hickman, we held invalid the defendant's conviction on three specific counts under § 1347 for violation of the Ex Post Facto clause.[56] Although we noted that a scheme to commit health care fraud is a continuing offense, we found that these three counts charged behavior that had been fully executed before the effective date of the statute.[57] With respect to continuing offenses in general, however, the Ex Post Facto clause is not violated by application of a statute to a continuing scheme that began before the effective date of a statute but continued thereafter.[58]

Unlike the Hickman indictment, the one-count indictment against Kirkham and Murphy did not charge them on or list any individual counts or executions of transactions that were fully executed before the effective date of the statute.  In fact, all of the executions listed in the indictment involved transactions that

---

[55] Hickman, 331 F.3d at 445.

[56] 331 F.3d at 447.

[57] Id. at 447.

[58] United States v. Duncan, 42 F.3d 97, 104 (2d Cir. 1994); United States v. Garfinkel, 29 F.3d 1253, 1259-60 (8th Cir. 1994).  See also Hammen, 977 F.3d at 385.

took place well after August 1996, and each "patient" who testified at trial was billed after 1998.  There is no danger that defendants were convicted on the basis of their pre-enactment behavior.[59]  We hold that, as no Ex Post Facto violation occurred, the trial court did not err by admitting the evidence in question.

G.    Calculating the Amount of Loss

Defendants also challenge the district court's sentencing calculation of the amount of loss caused by their fraudulent activity.  To avoid an Ex Post Facto violation at sentencing, both defendants were sentenced under the 2000 edition of the United States Sentencing Guidelines ("U.S.S.G.").  The court calculated a base offense level of six for a violation of § 1347 under former U.S.S.G. § 2F1.1(a) and adopted the intended-loss figures reported in defendants' Presentence Investigation Reports (PSR) in applying offense level enhancements under § 2F1.1.

Kirkham's PSR reported an intended loss of $6,654,634, resulting in a 14-level enhancement under § 2F1.1(b)(1)(O); Murphy's PSR reported an intended loss of $ 1,709,826, resulting in a 12-level enhancement under § 2F1.1(b)(1)(M).  For its calculation

---

[59] See United States v. Todd, 735 F.2d 146, 150 (5th Cir. 1984)(holding that evidence of conduct occurring prior to enactment of criminal statute did not violate ex post facto clause because the indictment for conspiracy included only two overt acts that occurred prior to the effective date of the statute and most —— but not all —— of the evidence presented at trial focused on events that took place after the effective date.)  In Todd we also relied on the fact that, as in the instant case, the record clearly established violations of the relevant statute after its effective date.  Id.

of restitution, the district court adopted the actual loss amounts stated in defendants' respective PSRs, resulting in a restitution order of $2,751,270 for Kirkham and $732,061 for Murphy. Although the district court computed defendants' sentences by including various other enhancements and adjustments, on appeal they challenge only the calculation of loss, intended and actual.

The Supreme Court's recent decision in United States v. Booker makes clear that imposition of a sentence based on facts found by the sentencing judge rather than by a jury or a confessing defendant, under a mandatory sentencing guidelines regime, violates a defendant's Sixth Amendment rights.[60] Under Booker, defendants clearly experienced such a violation of their constitutional rights when the trial court included in its loss calculations amounts not admitted by defendants or proved to the jury beyond a reasonable doubt.[61] We recently held, in United States v. Mares, that when a defendant has preserved his Sixth Amendment/Booker objection in the district court by an objection to his sentencing, we will ordinarily vacate and remand, unless we can say that the error is harmless under Rule 52(a) of the Federal Rules of Criminal

---

[60] 125 S.Ct. 738, 750-51 (2005).

[61] See 125 S.Ct. at 751, 769 (upholding circuit court's holding that, as the district court had applied the Guidelines as written and imposed a sentence higher than the maximum authorized solely by the jury's verdict, based on its finding that the defendant had possessed 566 grams of cocaine in addition to the 50 grams found by the jury, the defendant's Sixth Amendment rights had been violated).

Procedure.[62]  Although neither <u>Booker</u> nor its earlier state-Guidelines analog, <u>Blakely v. Washington</u>,[63] had been decided at the time of defendants' sentencing hearings, we hold —— and the government concedes —— that objections made by defendants at their sentencing hearings were sufficient to invoke their Sixth Amendment rights to the extent necessary to preserve their <u>Booker</u> objections. We hold further that defendants have preserved this argument on appeal, as they briefed their challenge to the district court's calculation of loss using amounts not found by a jury, specifically citing <u>Blakely</u> in their reply briefs that were filed with us after <u>Blakely</u> was decided but before <u>Booker</u>.

Defendant Kirkham objected to the court's calculations by arguing that "[t]he loss, if any, must be proved in Court.  The government never attempted to prove any dollar loss in this case.  Therefore, any loss attributable to Kirkham must be restricted to that alleged in the indictment."  Murphy made a similar objection to the court's calculations, stating that he objected "to the method of computing [his] punishment and fine or restitution without determining which scheme or attempted schemes were actually found by the jury to be executed."  He went on to insist that he "may be punished only for conduct found by the jury to be fraudulent on the allegations in paragraph C in the indictment. .

_____

[62] No. 03-21035, 2005 U.S. App. LEXIS 3653, at *24 n.9 (5th Cir. Mar. 4, 2005).

[63] 124 S.Ct. 2531 (2004).

31

. ." Even though neither defendant expressly cited <u>Apprendi</u>, <u>Blakely</u>, or the Sixth Amendment in his objections at his sentencing hearing, we hold that the above-quoted language, challenging the district court's sentencing based on facts — the quantum of actual or intended loss — not found by a jury was sufficient to inform the district court that defendants objected to their sentences under the Sixth Amendment. They thereby preserved their <u>Booker</u> objections to the district court's calculation of loss.[64]

As we stated in <u>Mares</u>, we will ordinarily vacate a defendant's sentence when he has preserved an objection to a <u>Booker</u> Sixth Amendment violation and we find the violation not to be harmless error.[65] Rule 52(a) of the Federal Rules of Criminal Procedure

---

[64] <u>See, e.g.,</u> <u>United States v. Dowling</u>, No. 04-10464, 2005 U.S. App. LEXIS 4725 at *7 - 13 (11th Cir. Mar. 23, 2005)(holding that, in order to preserve a <u>Booker</u> objection, a defendant must make a "constitutional" objection at sentencing, which may include citing <u>Apprendi</u>, the Sixth Amendment, or the defendant's right to have facts found by a jury instead of a judge); <u>United States v. Selwyn</u>, 398 F.3d 1064, 1066-67 (8th Cir. 2005)(holding that defendant had preserved his Sixth Amendment challenge to his sentence by objecting to drug quantity findings at his sentencing hearing); <u>United States v. Fox</u>, 396 F.3d 1018, 1027 (8th Cir. 2005)(finding that defendant had preserved his Sixth Amendment <u>Booker</u> objection to drug quantity finding by objecting to PSR's recommendation that he be found responsible for a greater quantity of methamphetamine than that for which the jury had convicted him). We requested supplemental briefing from both parties after publication of the Court's <u>Booker</u> decision and we note that the government also concedes that the defendants have preserved their <u>Booker</u> objections.

[65] 2005 U.S. App. LEXIS 3653 at *24 n.9. We note, however, that the Court's <u>Booker</u> opinion appears to suggest that we engage in a harmless error analysis only in cases <u>not</u> involving a Sixth Amendment violation. <u>See</u> 125 S.Ct. at 769 ("[I]n cases <u>not</u> <u>involving a Sixth Amendment violation</u>, whether resentencing is

32

provides that a harmless error is "any error, defect, irregularity or variance that does not affect substantial rights" and such error "must be disregarded." When harm is in question, we must determine whether such an error is harmless beyond a reasonable doubt before we will vacate a defendant's sentence; unlike plain error analysis, the government, not the defendant, bears the burden of persuading us that an error did not affect the defendant's substantial rights.[66]

---

warranted or whether it will instead be sufficient to review a sentence for reasonableness may depend upon application of the harmless-error doctrine.")(emphasis added). In cases involving particular constitutional violations, the Court has held that these defects "infect the entire trial process" and by their nature "necessarily render a trial fundamentally unfair," therefore obviating the need, once such a constitutional violation has been identified, for further analysis before reversing a defendant's sentence. Neder v. United States, 527 U.S. 1, 8 (1999)(listing such errors as complete denial of counsel, trial before a biased judge, racial discrimination in selection of grand jury, denial of public trial, and defective reasonable-doubt instruction as errors requiring reversal of a defendant's conviction because of their inherent harmfulness). As the government does not argue that the trial court's error was harmless in this case, however, we decline to speculate whether such an analysis would be necessary under these circumstances.

[66] Neder, 527 U.S. at 15; United States v. Olano, 507 U.S. 725, 734 (1993)(noting that, unlike harmless error analysis, in which the government bears the burden of showing no prejudice to the defendant's rights, plain error analysis places this burden on the defendant); United States v. Wheeler, 322 F.3d 823, 828 (5th Cir. 2003)("Unlike the harmless error analysis, it is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.")(citing Olano, 507 U.S. at 734); United States v. Tello, 9 F.3d 1119, 1131 (5th Cir. 1993)(stating that, as the party seeking to preserve the defendant's sentence under harmless error analysis, the government bears the burden of persuading the court that the district court would have imposed an identical sentence absent an

33

The government does not argue in this case that the district court's employment of the Sentencing Guidelines as mandatory did not affect defendants' substantial rights; rather, the government agrees that we must vacate defendants' sentences and remand for re-sentencing.  We glean no indication from the record on appeal that the mandatory nature of the Guidelines and the facts found by the court rather than by the jury did not affect the length of defendants' sentences.[67]  We therefore vacate their sentences and remand for re-sentencing.

## III. CONCLUSION

Although the defendants' indictment was technically duplicitous, they waived this argument by not raising it before trial, and they have not suffered substantial prejudice to their rights as a result of the flawed indictment.  Defendants have not shown that the district court erred or, if it did, that the error affected their substantial rights with respect to any of their other challenges to their conviction.  We therefore affirm defendants' convictions.

Not so for their sentences.  As defendants preserved their objections to the district court's calculation of loss under the

erroneous application of the guidelines).

[67] See United States v. Rogers, 126 F.3d 655, 661 (5th Cir. 1997)("The misapplication of a guideline is harmless error if the district court would have imposed the same sentence even in the absence of the error. . . The question is not whether the district court could have chosen the same sentence, but whether it would have chosen that sentence.")(emphasis in original).

34

sentencing guidelines, and the district court's use of facts that were neither admitted by the defendants nor found by the jury in determining defendants' sentences under the mandatory sentencing guidelines violated defendants' Sixth Amendment rights, their substantial rights were affected as a matter of law. We therefore vacate defendants' sentences and remand this case to the district court for re-sentencing.

CONVICTIONS AFFIRMED; SENTENCES VACATED AND CASE REMANDED FOR RE-SENTENCING.