*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0409p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 05-3173

NICHOLAS J. TRIANA, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-00099—John R. Adams, District Judge.

Submitted: July 19, 2006

Decided and Filed: November 2, 2006

Before: MARTIN and RYAN, Circuit Judges; MARBLEY, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** G. Richard Strafer, OFFICE OF G. RICHARD STRAFER, Miami, Florida, for Appellant. Bruce A. Khula, UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

MARBLEY, D. J., delivered the opinion of the court, in which MARTIN, J., joined. RYAN, J. (p. 16), delivered a separate opinion concurring except as to Part II.C.

_____

## OPINION

_____

ALGENON L. MARBLEY, District Judge. On March 3, 2004, in a five-count indictment, a federal grand jury charged Nicholas J. Triana (hereinafter, "Triana" or "Defendant") with various fraudulent acts: (1) Count 1 charged Triana with conspiring, under 18 U.S.C. § 371, with unindicted co-conspirators – his sister, Jolynn Peck ("Peck"), and his attorney, Brian Salvagni ("Salvigni"), and "others" – to defraud the Medicare and Medicaid programs and the United States District Court for the Northern District of Ohio, including the United States Probation Office; (2) Count 2 alleged that Triana committed health care fraud by "fraudulently" trying to circumvent the exclusion provision of his settlement agreement in violation of 18 U.S.C. § 1347; (3) Count 3 alleged that Triana violated the federal false statement statute, 18 U.S.C. § 1001, by allegedly failing to "notify" and/or

_____

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

by "conceal[ing]" from his probation officers that he had a "*de facto* ownership, interest and control" of two companies – FootCare Consultants, Inc. ("Footcare"), a company providing podiatric services to patients in nursing homes around Ohio, and Podiatry Administration, LLC ("Podiatry Admin."), a business allegedly performing marketing and other administrative services for Footcare; (4) Count 4 charged Triana with one count of bank fraud under 18 U.S.C. § 1344, for causing Peck, to file a loan application for a second home containing materially incorrect information; and (5) Count 5 charged Triana with making a false statement in an application for an automobile loan in violation of 18 U.S.C. § 1014. Triana went to trial, and a jury convicted him on Counts 1 through 4.

Triana now raises three issues on appeal. First, he asserts that the district court abused its discretion in refusing to allow the jury to consider his proposed jury instruction raising an entrapment by estoppel theory of defense. Second, he argues that the district court erred as a matter of law in basing its "loss" calculation under U.S.S.G. § 2B1.1 on Footcare's approximately $1.7 million in gross receipts from Medicare, when the fraud did not cause any *actual* losses to the Medicare program. Third, Triana argues that he should be resentenced in the aftermath of *United States v. Booker*, 125 S. Ct. 738, 747 (2005). For the reasons set forth below, although we **AFFIRM** both Triana's conviction and the district court's "loss" calculation, we **VACATE** Triana's sentence, and **REMAND** his case to the district court for resentencing in light of *United States v. Booker* and its progeny.

## I. BACKGROUND

### A. *Triana I*

Between 1987 and 1998, Defendant-Appellant, Triana, worked as a Doctor of Podiatric Medicine in Ohio, specializing in the treatment of elderly patients housed in nursing homes throughout the state. On September 28, 1998, Triana executed a plea agreement with the government under which he pled guilty to one count of health care fraud for inflated Medicare billing, in violation of 18 U.S.C. § 1347 (hereinafter referred to as *"Triana I"*). Under the terms of Triana's plea agreement, he agreed that he would not "personally, or through any entity he controls, i.e. through a direct or indirect ownership interest of five percent or more or an officer, agent, or managing employee (as defined in 42 U.S.C. § 1320a 5(b)) submit claims or cause claims to be submitted for program payment." Triana also reached a settlement with the United States Department of Health and Human Services ("HHS"), excluding him from participation in "Medicare, Medicaid and all other federal health care programs" for a period of eight years. According to the exclusion notice he received from HHS, Triana could receive "no program payment . . . for any items and services . . . including administrative and management services," and such restrictions on payment would occur whether he served as an employee, administrator, operator, or in any other capacity.

Pursuant to the above agreements, on January 29, 1999, the district court sentenced Triana to six months of imprisonment in Oriena House, a half-way house with work release privileges located in Akron, Ohio, to be followed by a two-year period of supervised release, pursuant to 18 U.S.C. § 3583. As a condition of Triana's sentence, he was required to "notify [his] probation officer any time he had an interest of five percent or more in any entity or practice which submits claims or causes claims to be submitted to . . . Medicaid or Medicare reimbursement." In addition, Triana was required to pay a fine of $10,000.00 and restitution in the amount of $83,644.00 "to be paid at a minimum rate of 15% of defendant's gross monthly earnings." In addition, effective June 11, 1999, the State of Ohio Medical Board permanently revoked Triana's podiatry license.

**B. Triana's Involvement in Footcare and Podiatry Admin.**

Because of his exclusion from Medicare and Medicaid programs, Triana was unable to obtain a Medicare or Medicaid provider number for any entity that he owned or controlled. Nonetheless, with the help of Salvagni, his corporate attorney and friend, Triana was able to create two new companies, Footcare and Podiatry Admin., and use them in a scheme that would enable him to participate, benefit from, and control a podiatry practice that billed Medicare. Although both Footcare and Podiatry Admin. were, in actuality, operated by Triana, Triana placed Dr. Stephen Castor ("Castor") at the helm of Footcare, and made his own sister, Peck, the owner and sole shareholder of Podiatry Admin.

In October 1998, Triana contracted to sell Castor his former podiatry practice under the name Footcare for $50,000.00, consisting of a $500 down payment and a promissory note for the balance of $49,500. Castor, a former bellhop at the Cleveland Airport Marriott, was a recent graduate of podiatry school who had been working for Triana without pay since early 1998 in the hopes of establishing himself as a podiatrist and eventually opening a podiatry practice in Ohio. Though Salvagni testified that the agreement between Triana and Castor was a standard-form contract, Castor's testimony at trial made clear that Triana had arranged the deal to allow him to maintain control of the operation while having Castor serve as a figurehead. First, despite the terms of the agreement, no money changed hands. Castor never paid Triana the $500 down payment required by the agreement, and Triana told Castor that he would not have to pay Triana any money on the $49,500 promissory note. Castor's eventual default on the note would, therefore, permit Triana to reclaim his practice at the appropriate moment. Second, Triana significantly limited Castor's power to oversee the business. From 1998 onward, Footcare hired at least thirty new podiatrists and took on hundreds of new nursing home clients. Castor never once authorized a contract, and was at all times restricted from looking at Footcare's books. Third, Triana ensured that Castor's salary was limited to 30% of the net receipts from work he billed plus a 5% administrative fee. Thus, despite the fact that after Castor "purchased" the company, Footcare grew exponentially, eventually achieving gross income upwards of $650,000 in 2001, Castor's salary was consistently under $70,000 per year. By limiting Castor's income, Triana was able to funnel the rest of the money to his second company, Podiatry Admin., under the guise of "management costs."

Salvagni also assisted Triana in creating Podiatry Admin., an Ohio limited liability company. Podiatry Admin. received a high percentage of Footcare's monthly gross profits, ostensibly in return for providing Footcare with both management and administrative services. In order to hide his control of the company, however, Triana recruited his younger sister, Peck, to serve as the owner and sole shareholder of the company. Peck was a recently-divorced, financially strapped elementary school teacher in Florida, who had no background in either health care or medicine. At trial, Peck testified that both Triana and Salvagni had assured her that after signing the appropriate paperwork, she would be "relieved of all responsibilities" regarding Podiatry Admin., including ever having to visit the company headquarters in Ohio. In return for permitting Triana to use her name, Peck received a $500 monthly stipend from the Podiatry Admin. account.

Footcare's podiatrists, allegedly "unaffiliated" with Triana, derived significant income from Medicare billing. The income passing from Medicare to Footcare and Podiatry Admin., was funneled to Triana in a number of ways. Because Footcare and Podiatry Admin. both maintained office space in a building owned by Triana, Podiatry Admin. credited Triana for thousands of dollars in rental expenses. Triana's office building contained four separate and nearly identical suites, and although the two other renters testified that they paid roughly $6,000 per year in rent, Podiatry Admin.'s rent was inexplicably higher, totaling approximately $80,000 per year. Podiatry Admin. also charged Footcare considerable sums for "administration" and "management" costs; such costs usually amounted to at least 57% of Footcare's monthly earnings. At trial, however, Podiatry Admin.'s former President, Theresa Kripinsky ("Kripinsky"), testified that despite Podiatry

Admin.'s high management fees, Podiatry Admin.'s services to Footcare were actually quite limited in scope. For instance, though Podiatry Admin. charged Footcare to perform its Medicare billing, in reality, Northcoast Medical Billing Service ("North Coast"), not Podiatry Admin., submitted all of Footcare's claims to Medicare. Kripinsky testified that Triana consistently instructed her to issue Podiatry Admin. checks to take care of his personal expenses. While serving as Podiatry Admin.'s President, Kripinsky used Podiatry Admin. checks to make Triana's restitution payments as well as monthly mortgage payments on his two condos. Further, Kripinsky used Podiatry Admin. funds to settle a number of Triana's bills from various stores such as Sam's Club, Kaufman's and Pier 1 Imports. On occasion, Triana also asked Kripinsky for blank checks from the Podiatry Admin. account to use for his own purposes. At trial, Kripinsky claimed that she quit because she was upset that between his salary and his various personal expenses, Triana consumed approximately 45% of all of Podiatry Admin.'s funds.

### C. Triana's Monthly Probation Reports

As a condition of his conviction in *Triana I*, Triana was required to cooperate with assigned United States Probation Officers and to provide them with truthful information regarding the nature of his employment and income. Though Triana argued that he was continuously truthful in completing his probation reports, at trial, the government adduced evidence suggesting that in addition to underreporting his financial assets significantly, Triana provided the probation officers with substantially inaccurate accounts of his involvement in Footcare and Podiatry Admin. For instance, though Triana told his probation officers that he was not involved with Medicare billing in any way, at trial, various witnesses testified that Triana often inquired of Footcare staff regarding claims submitted to Medicare, as well as any Medicare monies that were received. Further, in order to keep from piquing Medicare's suspicion about Footcare's billing procedures, Triana consistently instructed Footcare podiatrists to bill with a lower patient code whenever possible. Most shocking, when Matthew Simpson, a fraud investigator at Nationwide Insurance Company, came to Footcare's home office to perform an audit, Triana representing himself as Castor, went through the necessary audit procedures with him, ensuring that Simpson would not learn any potentially incriminating or fraudulent information.

### D. The Course of Proceedings in *Triana II*

In July 2000, the FBI began to suspect that Triana was skirting the requirements of his sentence in *Triana I*, as well as his settlement agreement with HHS. Hence, on March 3, 2004, after the FBI had completed a thorough investigation, a federal grand jury returned the five-count indictment for conspiracy, health care fraud, making false statements and bank fraud, currently at issue (hereinafter referred to as "*Triana II*").

At trial, Triana presented a proposed theory of defense jury instruction on entrapment by estoppel. Triana asserted that because there was ample evidence at trial to show that he had been forthcoming about his involvement in both Footcare and Podiatry Admin., he should not now be punished for his reliance on his USPOs' implied ratification of his actions. The district court denied the jury instruction, finding both that there was no evidence in the record to support Triana's claim that he had informed his USPOs that he had any interest in either Footcare or Podiatry Admin. and that Triana had been "indirectly" receiving funds from Medicare since being sentenced in *Triana I*.

Triana was found guilty, and the government's sentencing memorandum recommended numerous sentence enhancements from the Federal Sentencing Guidelines (the "Guidelines"), that, when combined, raised Triana's offense level from a base level of 7 to at least a 33. The government urged the following enhancements: (1) a two-level enhancement under U.S.S.G. § 2B1.1(b)(1)(7)(C) for Triana's violation of a prior court order; (2) a two-level enhancement under U.S.S.G. § 2B2.2(b)(8)(C) for Triana's use of sophisticated means in concealing his involvement in Footcare

and Podiatry Admin.; (3) a two-level enhancement under U.S.S.G. § 3A1.1 for Triana's knowledge that a victim of the offense, nursing home patients, was a "vulnerable victim"; (4) a two-level enhancement under U.S.S.G. §§ 3B1.3 and 3B1.3(c) for a person who both "abuses a position of trust during the course of illegal activity" and is the "leader, manager, or supervisor of criminal activity." Although Triana objected to each of the government's proposed enhancements, the district court overruled his objections.

The government also argued for an 18-point enhancement under U.S.S.G. § 2B1.1 for the substantial loss to Medicare caused by Triana's fraud. The government recommended that the district court adopt the $2,922,967.90 in bills Footcare submitted to Medicare – the "intended loss" – as the loss attributable to Triana under the Guidelines. Triana objected and argued that because all of Footcare's services were legitimate services to Medicare-eligible patients, the appropriate "loss" under U.S.S.G. § 2B1.1(a)(1) was zero. In its discretion, the district court adopted the $1,764,199.36 Footcare received from Medicare – the "actual loss" – adding 16 points to Triana's base offense level, instead of the government's recommended 18.

Accordingly, the district court calculated Triana's offense level to be a Level 1, Category III, and sentenced him to the following concurrent sentences: Count 1- 60 months; Count 2 - 120 months; Count 3 - 60 months; Count 4 - 135 months. The district court also ordered Triana to pay $1,764,199.6 in restitution, and to serve three years on supervised release. As set forth above, Triana now appeals his conviction and his sentencing on three bases: (1) that the district court erred in failing to allow his entrapment by estoppel jury instruction; (2) that the district court erred in calculating "loss" under the U.S.S.G. § 2B1.1; and (3) that Triana must be resentenced in light of *United States v. Booker*.

## II. ANALYSIS

### A. Jury Instruction

At trial, Triana submitted a proposed jury instruction, which raised an entrapment by estoppel defense for Counts 1 through 5.[1] Triana's based his proposed instruction on his assertion that there was ample evidence to show that because he was consistently forthcoming about his involvement in both Footcare and Podiatry Admin., he should not be punished for his reliance on his probation officers to inform him of any potential violations. The district court found Triana's theory untenable, and refused to present his requested theory of defense instruction to the jury. The district court explained that there was "[n]o evidence . . . that the Government or an agent thereof affirmatively informed the Defendant that his conduct was legal," or that Triana relied on any such announcement.

---

[1]The proposed jury instruction stated:

Defendant Nicholas J. Triana, Jr., claims that he is not guilty of the willful or deliberate wrongdoing as charged in Counts I through V of the indictment because he acted on the basis of authorization from the Government.

If before taking any action, Defendant Nicholas J. Triana, Jr., acted in good faith, and the Government:

First: Through an authorized Government official, empowered to render the erroneous advice to the Defendant;

Second: Who was made aware of all relevant historical facts;

Third: Affirmatively told the Defendant that his conduct was permissible;

Fourth: And That the Defendant relief [sic.] on this false information; and

Fifth: The Defendant's reliance was reasonable.

Further, the district court noted that it had "repeatedly g[iven] [Triana] the opportunity to provide any evidence to support this [entrapment-by-estoppel] defense" and did not require him to take the stand in order to present such evidence. Triana's first assignment of error is that the district court's decision not to adopt his defense instruction was an abuse of discretion entitling him to a new trial on Counts 1 through 4.[2]

A district court must grant an instruction on the defendant's theory of the case if the theory has some support in the evidence and the law. *United States v. Duncan*, 850 F.2d 1104, 1117-18 (6th Cir. 1988). An instruction which lacks evidentiary support or is based upon speculation should not be given. *United States v. Lindo*, 18 F.3d 353, 356 (6th Cir. 1994). The proposed instruction must adequately submit the issues and applicable law to the jury. *United States v. Brown*, 946 F.2d 1191, 1194 (6th Cir. 1991).[3]

This Court reviews a district court's decision not to give a jury instruction for abuse of discretion. *See United States v. Ursery*, 109 F.3d 1129, 1136 (6th Cir. 1997); *see also, United States v. Colon*, 268 F.3d 367, 373 (6th Cir. 2001). When conducting such review, this Court reverses the trial court if it finds that: (1) the proposed instruction is substantially correct; (2) the proposed instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impaired the defendant's theory of the case. *See United States v. Newcomb*, 6 F.3d 1129, 1132 (6th Cir. 1993) (citations omitted); *see also Morgan*, 216 F.3d at 566; *see United States v. Newcomb*, 6 F.3d 1129, 1133 (6th Cir. 1993) (assuming, *arguendo*, that the theory of defendant's requested instruction was legally sound, noting that if the government relies on legal error as the basis for its refusal to give an instruction, the district court is responsible for making the necessary alterations to the instruction). Although a jury instruction "should not be given if it lacks evidentiary support or is based upon mere suspicion or speculation," *United States v. James*, 810 F.2d 674, 675 (6th Cir. 1987) (citation omitted), so long as there is even weak supporting evidence, "[a] trial court commits reversible error in a criminal case when it fails to given an adequate presentation of a theory of defense." *United States v. Plummer*, 789 F.2d 435, 438 (6th Cir. 1986).

Entrapment by estoppel applies when an official tells a defendant that certain conduct is legal and the defendant believes that official to his detriment. *See Cox v. Louisiana*, 379 U.S. 559 (1965) (to find defendant liable for violating a statute when defendant relied on the Chief of Police's incorrect advice that his actions would be lawful "would be to sanction an indefensible sort of entrapment by the State"); *see also, Raley v. Ohio*, 360 U.S. 423 (1959). As a threshold requirement, Triana must show that an evidentiary basis exists upon which the instruction can be issued. *Morgan*, 216 F.3d at 566. In order to prove the defense of entrapment by estoppel, a defendant must show that: (1) a government agent announced that the charged conduct was legal; (2) the defendant relied on the agent's announcement; (3) the defendant's reliance was reasonable; and (4) given the

---

[2]Though the language of Triana's proposed jury instruction set forth an entrapment by estoppel defense on counts 1 through 5, Defendant-Appellee's brief state that "the requested instruction applied only to Counts 1-3." *See* Defendant-Appellee's Brief at 55. The Brief goes on to state that this Court must now find that the faulty jury instructions on Triana's defense to counts 1 through 3 also infected count 4 because in successfully opposing Triana's pre-trial motion to sever counts 4 and 5, the government argued that count 4 was "inextricably intertwined" with the charges in counts 1 through 3.

[3]Relying on authority from various other circuits, Triana proposes that his threshold evidentiary burden is *extremely low*, and that he is entitled to his requested jury instruction if there is any supporting evidence whatsoever, regardless of whether that evidence is tenuous. *See United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995); *Perez v. United States*, 297 F.2d 12, 15-16 (5th Cir. 1961); *United States v. Pedroza*, 750 F.2d 187, 204-05 (2d Cir. 1984) (emphasis added). In *Morgan*, however, this Court held that when an instruction "lacks evidentiary support," or is based on "speculation," it should not be given. *See* 216 F.3d 557, 566 (6th Cir. 2000). Therefore, Triana's argument that his tenuous evidence is enough to establish a basis for his requested instruction is without merit.

defendant's reliance, prosecution would be unfair. *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992).

This Court holds that the district court did not abuse its discretion in rejecting Triana's entrapment by estoppel defense because Triana failed to put forth evidence sufficient to satisfy the first prong of the entrapment by estoppel test. Triana concedes that no government official ever *explicitly* told him that his actions were legal, but he asserts that because he was forthcoming about his involvement in Footcare and Podiatry Admin., his probation officers' failure to prohibit his activities actively amounted to an implied ratification of his actions. This Court finds Triana's arguments to be disingenuous in light of the evidence established at trial. Because Triana was made plainly aware of the requirements of his *Triana I* sentence on more than one occasion, it strains this Court's credulity that he did not know that his control of Footcare and Podiatry Admin. was illegal. Moreover, Triana cannot now blame his probation officers for "failing to alert" him to any illegality when the evidence at trial demonstrated that he withheld any incriminating information from them.

### 1. Triana's Knowledge of Illegality

Triana was informed by a number of different authorities that becoming too involved in Footcare and Podiatry Admin. would violate his sentence in *Triana I*. Upon being sentenced by the district court in *Triana I*, Triana was explicitly instructed by the terms of his plea agreement as well as by the HHS letter of exclusion that he was to be excluded from participating in *any manner* whatsoever with federal health care programs, including Medicare, for a period of eight years.[4] By accepting the foregoing terms in a number of different contexts and circumstances, Triana clearly knew his legal obligations, and continuously attempted to circumvent them.

At trial, Salvagni testified that as Triana's corporate attorney, he continuously instructed Triana that he must remain in compliance with the terms of his *Triana I* sentence. Salvagni stated that though he helped to create Footcare and Podiatry Admin., he informed Triana that to comply with the law, Triana could have *no* power or authority over either entity. Salvagni testified that he told Triana that, "he had to remain in an administrative capacity. That there was a spectrum, is the way I explained it to him on a number of occasions. There was a spectrum where if he swept the floors of [Podiatry Admin.] and did menial work that there would clearly have been, in my opinion, you know, no issue." Nonetheless, Triana controlled both the actions of Castor with respect to Footcare, and the actions of Peck with respect to Podiatry Admin. Accordingly, he enjoyed unlimited discretion with both companies, and, in using his knowledge of the Medicare system, his physician contacts with nursing homes, and his ongoing podiatry practice, he pursued profit above all else.

---

[4]The language present in the Plea Agreement, the Judgment and Order, and the HHS exclusion letter was as follows.

> The defendant understands that following the exclusion, he cannot personally, or through any entity he controls (i.e., through a direct or indirect ownership interest of five percent (5%) or more or an officer, agent, or managing employee . . . submit claims or cause claims to be submitted for program payment. He further understands that violations of the conditions of the exclusion may result in criminal prosecution and the imposition of civil monetary penalties.

Triana's blatant disregard for the express instructions of his *Triana I* settlement as well as the exclusion letter of HHS resembles the actions of the defendant in *United States v. Morgan*, a case in which this Court considered whether a district court had erred in refusing to allow a defendant's entrapment by estoppel defense theory. *See* 216 F.3d at 557. In *Morgan*, defendant Morgan appealed his three-count jury conviction for being a felon in possession of a firearm, an unregistered machine gun, and a machine gun. *Id.* Morgan claimed that he was entitled to an entrapment by estoppel jury instruction because police officers had led him to believe that his actions were legal. *Id.* Evidence set forth at trial showed that on more than one occasion, police officers, finding over 58 firearms in Morgan's possession, had expressly told him that it was *illegal* for him to have the guns, and that though he could not sell them, he had to find a way to dispose of them. *See id.* Morgan asserted that because the police officers never told him a specific deadline by which he had to dispose of the firearms, and because he had intended to give the guns to his parents eventually, he was entitled to a defense of entrapment by estoppel. *Id.* at 560-61. This Court, however, upheld the district court's decision, explaining that because police officers had expressly told Morgan on more than one occasion that his actions were *per se* illegal, he could not now claim they had *approved* of his behavior. *Id.* (emphasis added). In this case, much like in *Morgan*, Triana admits that government officials never expressly told him his actions were legal. And, like Morgan, Triana was at all times apprised of the requirements of both his sentence and the law. The Court finds it illogical to allow Triana to now claim "ignorance" in the face of clear instruction from the district court, HHS, his probation officers, and his own attorney.

## 2. Failure to Disclose

Further, according to the testimony of one of Triana's probation officers, Eric Corns ("Corns"), Triana consistently withheld key information about his involvement with Footcare and Podiatry Admin. from his probation officers that would have put them on notice of the illegality of his actions. In failing to disclose all relevant information to the USPOs, Triana could not reasonably rely on them to inform him when he was in breach of his *Triana I* settlement.

Pursuant to their statutory duties, probation officers, who are assigned a case-load of approximately sixty files at a time, are required to verify monthly forms completed by defendants describing their employment, their daily schedule, and their finances. According to the United States Probation Office "Chronological Record" submitted into evidence in this case, from 1998 through his dismissal from probation in 2001, Triana either failed to disclose or covered up information he presented to each of the probation officers to take his case.[5] Triana consistently reported that he was working for a doctor's office as an "administrative assistant." At trial, however, Castor and others testified that Triana's role in the company did not comport with his title. In addition, Triana also consistently reported monthly income of approximately $950.00, excluding his rental income of approximately $7,000, which he stated was mostly used for property expenses. In truth, however, Triana's use of approximately 45% of Podiatry Admin. finances for personal use put his "monthly income" at a level far above that which he reported. Moreover, though Triana consistently listed his supervisor as "Penny Tuley," at trial, Ms. Tuley testified that as the Podiatry Admin. office manager, she was *never* Triana's supervisor and was in fact subject to his direction at all times. Triana sought to hide the depth of his participation in Footcare and Podiatry Admin., and the information in Triana's reports was clearly far outside the realm of reality.

As Corns testified at trial, Triana's probation officers did not have access to any Footcare or Podiatry Admin. records other than what Triana gave them. Hence, the only information the probation officers had on which to base a decision *not* to charge Triana with a violation was Triana's

---

[5]In October 2000, because Triana moved from Port Clinton, Ohio to Strongville, Ohio, his case was transferred to probation officer Dodds. Further, on August 1, 2001, Triana's case was again transferred from probation officer Dodds to Urda.

consistent misrepresentation that he was only tangentially involved with both Footcare and Podiatry Admin. In addition, Corns testified that probation officers are not accountants, attorneys, or fraud investigators, and that they have no background in the complex forums of Medicare, Medicaid or other federal health insurance programs. Thus, probation officers are not trained to investigate complex health care fraud such as Triana's. Further, Corns testified that probation officers are not trained to act as "legal advisors" to offenders in any way. Since, through his demonstrably false assertions, Triana effectively prevented the USPOs from developing a thorough knowledge of his business practices, he cannot now impose on them the obligation to have declared his activities verboten.

Defendant claims that his reliance on the advice of the probation officers makes his case similar to that of the defendant exonerated in *United States v. Hedges*, 912 F.2d 1397, 1405-06 (11th Cir. 1990). This Court disagrees. In *Hedges*, the Eleventh Circuit found that the district court had erred in refusing to give an entrapment by estoppel instruction to the defendant who had relied on advice given to him by a "standards of conduct officer." *See id*. at 1397. When defendant Hedges, a former Colonel in the United States Air Force, was looking to retire from military duty, he sought advice from Captain Lehman, the Standards of Conduct Counselor charged with advising personnel about conflict of interest matters. *Id*. at 1398-99. Hedges sought work as a defense consultant for Sperry Corporation ("Sperry"), one of the bidders on a military contract for which Hedges had been responsible while serving as a Colonel. *Id*. at 1399. Hedges told Sperry that he would not accept employment with them until Lehman told him it would comply with all conflict of interest laws, and, after Sperry had sent him a draft agreement, he passed it along to Lehman. *Id*. The agreement contained no salary or terms of employment, and though Lehman edited it to satisfy any conflict of interest concerns, he never told Hedges that he should wait until his terminal leave began before proceeding with negotiations with Sperry. *Id*. at 1399-1400. At trial, the jury found that because Hedges had negotiated with Sperry before he was officially placed on terminal leave, he had violated military conflict of interest laws. *Id*. at 1400. On appeal, however, the Eleventh Circuit, relying on "principles of fairness" rather than the "defendant's mental state," found that the district court had erred in refusing to allow Hedges entrapment by estoppel defense and reversed Hedges' conviction. *Id*. at 1406.

Triana argues that just as Hedges provided Lehman with all relevant information regarding his proposed work with Sperry, in this case Triana had provided all relevant information to the probation officers. This Court disagrees. Unlike Hedges, Triana consistently altered or failed to disclose financial and work-related information that showed him to be in clear violation of his sentence. Moreover, where Hedges, who had no criminal history, had placed himself wholly in Lehman's hands, in this case, Triana, who has once before been found guilty of fraud, made sure that he did not reveal the full extent of his business-related activities to the USPOs. Thus, where the *Hedges* court found it "unfair" to prosecute Hedges for his actions, in this case fairness dictates the opposite result.

As demonstrated by the foregoing analysis, Triana provided no evidence to support his proposed entrapment by estoppel jury instruction. Accordingly this Court **AFFIRMS** Triana's convictions on all grounds.

### B. Loss Calculation

U.S.S.G. § 2B1.1[6] is the Guideline used by courts in determining "loss" for fraud cases.[7] The Guideline enhances a defendant's sentence to correlate to the amount of loss caused his fraud. *See* U.S.S.G. § 2B1.1(b)(1).[8] Application Note 2 to § 2B1.1 provides guidance for the determination of loss. The application note states that "loss is the greater of actual loss or intended loss." *Id*. § 2B1.1, cmt. (n.2) (2002). "[A]ctual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" is "the pecuniary harm that would have been impossible or unlikely to occur." *Id*. § 2B1.1, cmt. (n.2(A)(I) and (ii)). In situations where the losses occasioned by financial frauds are not easy to quantify, the district court need only make a reasonable estimate of the loss, given the available information. *Id*. § 2B1.1, cmt. (n.2(C)). Such estimates "need not be determined with precision." *United States v. Miller*, 316 F.3d 495, 593 (4th Cir. 2003).

At trial, Janet Siriano ("Siriano"), a long-time, government-contracted benefit integrity analyst involved with both Medicare investigations of Triana, testified that from July 1999 through 2003, Footcare billed Medicare for $2,922,967.90, and received $1,764,199.36.[9] Based upon Siriano's estimates, the government's sentencing memorandum suggested that under the Guidelines, because the intended loss was over $2.5 million, Triana should get an 18-point enhancement. The government also noted that should the district court find that the approximately $1.7 million actual loss was the more appropriate measure of Medicare's loss, it should apply a 16-point enhancement. *Id*. at 383. Defendant objected to both enhancements asserting that because the services billed to Medicare were legitimate podiatric services for qualified Medicare recipients, Medicare had suffered no loss for which Defendant could be held liable.

At sentencing, the district court, relying on *United States v. Brown*, 151 F.3d 476 (6th Cir. 1998) and *United States v. Nastasi*, 2002 WL 1267995 (E.D.N.Y. Apr. 17, 2002), found that Triana's above argument "misse[d] the point," because given that under the exclusion, Medicare would not pay money to any entity with which Triana was associated, the "evidence showed that Medicare

---

[6]The Guidelines were amended, effective November 1, 2001, and § 2F1.1 of the Guidelines was deleted as part of that amendment. Under the revised version of the Guidelines, "loss" in fraud cases is calculated under a revised version of § 2B1.1. Some cases cited in this Opinion, however, were decided prior to those amendments, and, therefore, referenced § 2F1.1, as opposed to § 2B1.1. § 2B1.1 is the Federal Sentencing Guideline for larceny, embezzlement, and theft, and the commentary to § 2B.1.1 emphasizes the *amount taken* from the victim as the primary measure of loss: "The value of the property stolen plays an important role in determining sentences for theft and other offenses involving stolen property because it is an indicator of both the harm to the victim and the gain to the defendant." U.S.S.G. § 2B.1.1, Background, ¶ 1.

[7]According to the Guidelines, the greater the loss, the greater the corresponding enhancement level:

| Loss (Apply the Greatest) | Increase in Level |
|---|---|
| * * * | |
| (I) More than $1,000,000 | add 16. |
| (J) More than $2,500,000 | add 18. |

U.S.S.G. § 2B1.1.

[8]Because the base offense level in fraud cases often does not identify the seriousness of the offense, the Guidelines are intended to offer a series of ways to enhance a fraud sentence, allowing what the Seventh Circuit in *United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991), has called "bonus punishment points for different levels of proven loss beginning with $2,000." *See United States v. Khan*, 969 F.2d 218 (finding that because defendant was ineligible for the fraudulent social security benefits he applied for, his sentence should not be enhanced by the "intended" loss).

[9]This information was encapsulated in Government Exhibit #26, which Siriano authenticated and, upon instruction of the court, signed in the presence of the jury.

would not have paid [Footcare] but for the fraud." The district court then held Triana accountable only for the $1,764,199.36 in actual losses suffered by Medicare – not the $2,922,967.90 in intended losses – requiring an offense level increase of 16.

Defendant's next assignment of error is that the district court erred as a matter of law in basing its "loss" calculation under U.S.S.G. § 2B1.1 on Triana's approximately $1.7 million in gross receipts from Medicare when the fraud did not cause any *actual* losses to the Medicare program. According to Defendant, as he stated in his objection at trial, there was nothing fraudulent about Footcare's billings because the services in question "were all properly performed by licensed podiatrists" working for Footcare, and the patients were all Medicare-eligible and entitled to the treatment. Moreover, assuming *arguendo* that this Court finds that a "loss" did occur, Defendant asserts that the "loss" figure should have been reduced to the amount of money actually taken improperly by Triana in excess of the less than 5% permitted under the exclusion.

The Court reviews a district court's findings of fact at sentencing as to "loss" and restitution for "clear error," and its methodology for calculating loss *de novo*. *United States v. Rothwell*, 387 F.3d 579, 582 (6th Cir. 2004); *see also, United States v. DeSantis*, 237 F.3d 607, 611 (6th Cir. 2001). Under the Guidelines, the district court is to determine the amount of loss by a preponderance of the evidence, and the district court's findings are not to be overturned unless they are clearly erroneous. *United States v. Guthrie*, 144 F.3d 1006, 1011 (6th Cir. 1998); *see also United States v. Bracciale*, 374 F.3d 998, 1003 (11th Cir. 2004) (nothing that "the district court cannot merely 'speculate' as to the proper amount of loss). However, "whether those facts as determined by the district court warrant the application of a particular guideline provision is purely a legal question and is reviewed *de novo* by this court." *United States v. Garner*, 940 F.2d 172, 174 (6th Cir. 1991).

The Court agrees with the district court's determination that this case falls squarely within our reasoning in *United States v. Brown*, 151 F.3d 476 (6th Cir. 1998). In *Brown*, defendant Brown was convicted of fraud relating to the provision of "Section 8 housing benefits" from the United States Department of Housing and Urban Development ("HUD"). *Id*. at 479. As the administrator of the program, Brown was supposed to place applicants for benefits on a waiting list and then select persons from that waiting list in a particular order. *Id*. Instead, Brown accepted bribes and other consideration from individuals, and, in return, chose those individuals off the waiting list out of order. *Id*. At sentencing, pursuant to the Guidelines, the district court tried to calculate the actual and intended losses suffered by HUD. *Id*. at 488. The actual loss figure in Brown's PSR "represented the money which, at the time of [his] conviction, HUD had already expended on those individuals who had improperly received Section 8 benefits through Brown," and the intended loss figure "covered those individuals who [had] received a certificate or voucher, but who [had not yet] actually received Section 8 benefits. . ." *Id*. The district court adopted the actual and intended loss figures from the PSR, explaining that all it had to find is the "diversion of funds." *Id*.

On appeal, Brown adopted an argument very similar to that which Triana now asserts, contending that "HUD incurred no loss because the people who received housing were eligible, in a financial sense." 151 F.3d at 489. In upholding the district court's calculation, however, this Court explained that by choosing people out of order, Brown had "diverted or attempted to divert funds from the recipients contemplated by the application regulations." 151 F.3d at 489. Further, this Court noted that "it is *irrelevant* that the action recipients were financially eligible, given the fact that they were certainly not 'next in line' for benefits. . ." *Id*. (emphasis added). Similarly, in this case, Triana's argument that the fact that each recipient of Footcare podiatric services was eligible to receive Medicare benefits meant that Medicare had not incurred a loss, fails to consider the important

fact that Triana's participation in Footcare made it ineligible for the receipt of *any* Medicare funds whatsoever, regardless of the services it provided.[10]

Defendant relies on *United States v. Schneider*, 930 F.2d 555 (7th Cir. 1991) to assert that should the Court determine that a loss did indeed occur, it should at least recalculate that loss to encompass only the percentage of the $1.7 million plus awarded to Footcare by Medicare that Triana took for himself; in other words, Triana's improper gain. In *Schneider*, defendants, husband and wife, submitted bids for a government construction contract which included fraudulent information. *Id.* at 556. In calculating the victims' loss from defendants' fraud, the district court used the "amount bid" by each defendant. *Id.* at 557. The Seventh Circuit, however, reversed on appeal, explaining that the estimate of the loss bore no relation to the economic reality, and suggesting that:

> . . . it is necessary to distinguish between two types of fraud. One is where the offender – a true con artist . . . – does not intend to perform his undertaking, the contract or whatever; he means to pocket the entire contract price without rendering any service in return. In such a case the contract price is a reasonable estimate of what we are calling the expected loss, and we repeat that no more than a reasonable estimate is required. The other type of fraud is committed in order to obtain a contract that the defendant might otherwise not obtain, but he means to perform the contract (and is able to do so) and to pocket, as the profit from the fraud, only the difference between the contract price and his costs.

*Id.* at 558 (internal citations omitted).

Accordingly, the Court finds that the district court did not abuse its discretion in determining that Triana's actions caused an approximately $1.7 million "loss" to Medicare. Under the terms of Triana's *Triana I* sentence, he was excluded from participation in Medicare and Medicaid programs. By extension, Triana's substantial participation in Footcare made the company ineligible for participation in Medicare and Medicaid as well. Therefore, as in *Brown,* while defendant's efforts to divert HUD funds to allegedly "eligible" applicants did not mean that he had caused no losses to HUD, Triana's attempt to divert Medicare funds to Footcare caused a loss to Medicare regardless of whether Footcare hired legitimate podiatrists or provided services to legitimate Medicare beneficiaries.

---

[10]Moreover, this Court is also persuaded by the district court's reasoning in *United States v. Nastasi*, 2002 WL 1267995 (E.D.N.Y. Apr. 17, 2002). In *Nastasi*, four defendants and the "Nastasi Companies," which were purportedly owned by the defendants, pled guilty to conspiracy to commit health care fraud by concealing the true ownership of the Nastasi Companies by the titular defendant, Mr. Nastasi ("Nastasi"). *Id.* at *1. Like Triana, Nastasi had a prior federal conviction for health care fraud, and HHS had excluded him from participating in the Medicare and Medicaid programs for 25 years. *Id.* With full knowledge of his exclusion, however, Nastasi participated in a scheme through which he and his relatives, listing straw-people as owners on the Medicare/Medicaid applications, actually owned and operated a number of entities (the "Nastasi Companies"), which subsequently billed over $57 million to Medicare and Medicaid illegally. *Id.*

During sentencing, the government asked the district court to calculate loss pursuant to application note 8(d) of U.S.S.G. § 2F1.1, which dealt with "Diversion of Government Program Benefits." *Nastasi*, 2002 WL 1267994, at *2. The defendants, however claimed that such a calculation would be inappropriate under the circumstances. *Id.* at *3. They asserted that because the Nastasi Companies actually provided services to "individuals qualified for Medicare or Medicaid benefits," no loss had occurred to Medicare. *Id.* The district court and the appellate court rejected the defendants' arguments, noting that "the 'intended recipients' of those benefits are not, as the defendants argue, individuals qualified for Medicare or Medicaid, but instead are entities qualified to participate in, and receive reimbursement from those programs." *Id.* The *Nastasi* court explained that, "[b]ecause the Nastasi Companies should have been excluded from participation in the Medicare and Medicaid programs, they were not 'intended recipients' under the programs, and thus the 'benefits' of those programs were 'diverted.'" *Id.* Similarly, in Triana's case, because he, and by association, Footcare, should have been excluded from participation in Medicare and Medicaid for eight years, regardless of whether Footcare podiatrists had provided proper treatment to qualified elderly Medicare patients, he had improperly diverted over $1.7 million in benefits to Footcare.

Moreover, Triana's assertion that the Court should substitute its previous loss calculation with an estimate of his own *personal* gain, is not well-taken where Triana's efforts to circumvent his settlement in *Triana I* demonstrate that his case does not warrant such leniency. Although this Court recognizes that there may be some cases of fraud in which the facts surrounding a defendant's wrongdoing demand more leniency than the statutory formulas may allow, this, unlike *Schneider,* is not one of those cases. Triana has one previous conviction for health care fraud, and his actions in creating and subsequently hiding his involvement in both Footcare and Podiatry Admin. showcase a sophisticated plan meant to circumvent his prior punishment. Further, courts have consistently held that in calculating loss, "substitution of defendants' gain is not the preferred method because it ordinarily *underestimates* the loss." *See United States v. Snyder*, 291 F.3d 1291, 1295 (11th Cir. 2002); *see also, United States v. Chatterji*, 46 F.3d 1336 (4th Cir. 1995); *United States v. Haddock*, 12 F.d 950, 960 (10th Cir. 1993).

Therefore, regardless of Triana's assertion that his scheme was not akin to that of a true "con-artist," because this Court finds that a quantifiable, actual loss can be attributed to Triana's conduct, it will not substitute Triana's percentage of gain for that actual loss. Accordingly, the Court hereby **AFFIRMS** the district court's loss calculation.

## C. Sentencing

The district court sentencing hearing was convened on the morning of January 12, 2005 when the Guidelines were still mandatory. That same day, the Supreme Court issued its opinion in *United States v. Booker*, 125 S. Ct. 747 (2005), holding that the Guidelines are advisory, not mandatory. Incidental discussion during the sentencing hearing indicates that neither the parties nor the district court was aware that *Booker* had been decided at the time that it sentenced Triana. Accordingly, Triana argues that if the Court declines to overturn his conviction on counts 1 through 4, it must vacate his sentence, and re-sentence him pursuant to *United States v. Booker.*

As a threshold matter, the parties dispute the standard of review applicable to their appeal regarding the methodology used in the loss calculation portion of Triana's sentencing. Triana argues that his sentencing should be reviewed under a "preserved error" standard[11] because at trial, his counsel expressly objected to the constitutionality of the Guidelines. *See* 542 U.S. 296 (2004). The government counters that because Triana did not raise timely express sentencing challenges under *Booker*, this Court must review the district court's ruling for "plain error."[12]  *See* 125 S. Ct. at 747. The government concedes, however, that even under a "plain error" standard of review, Triana's sentence should be vacated and remanded. Though the government's concession diminishes the importance of whether the Court adopts "plain error" or "preserved error" review, because the Sixth Circuit has yet to address the issue of what constitutes "preservation" of a *Booker* objection at trial, an analysis follows.[13]

---

[11]In cases receiving "preserved error" review, a reviewing court looks at the case *de novo* to determine whether there is error. If error is found, it is generally subject to a "harmless error" analysis. *See* FED. R. CRIM. P. 52(a).

[12]"[B]efore an appellate court can correct an error not raised at trial, there must be (1) an error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461 (1997); *see* FED. R. CRIM. P. 52(b)

[13]As in this case, in *U.S. v. Nanez*, 168 Fed. Appx. 72, 79 (6th Cir. 2006), the parties disputed whether the Court should apply a "preserved error" or "plain error" standard of review. Because the Court found it appropriate to vacate defendant's sentence even under the more stringent plain error review, it did not address the issue of whether defendant's sentencing objections preserved his Sixth Amendment claim. *Id*. at 79, n. 3.

Defense counsel objected to the "harshness" of Triana's sentence under the Guidelines, stating.

> I think the courts have seen, and I think this is also perhaps why there is a wholesale movement away from the [G]uidelines, in any event based on the Fanfan case that was just argued in the Supreme Court, is the results under the [G]uidelines have proved to be far harsher than before we had the [G]uidelines. So that which was supposed to promote equity in sentencing has actually resulted in unfairness in sentencing. And this would be a good example.

Triana asserts that the foregoing objection suffices to raise a constitutional objection, entitling him to *de novo* review of his sentence. The government disagrees.

This Court has not directly addressed the issue of what amounts to a timely constitutional objection. Other circuits have noted, however, that "there exists some question 'whether, in cases not involving a Sixth Amendment violation, there must be an objection to the mandatory nature of the guidelines in order to preserve that error on appeal, or whether a general objection to the sentence imposed under the [G]uidelines is sufficient to preserve a *Booker* challenge." *See United States v. Akpan*, 497 F.3d 360, 376, n.53 (citing *United States v. Sayre*, 400 F.3d 599, 599-600 (8th Cir. 2005)).

The Court finds *United States v. Candelario*, 240 F.3d 1300, 1303-04 (11th Cir. 2001) to be instructive on the issue of the requisites for a constitutional objection, although it is a pre-*Booker* decision. In *Candelario*, the Eleventh Circuit focused on the distinction between constitutional objections and non-constitutional objections for a defendant appealing his conviction and sentence for conspiracy to traffic crack cocaine, and possession of crack cocaine under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (holding that "any fact [other than a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"). *See* 240 F.3d at 1300. The *Candelario* court noted that "not every objection is a constitutional objection," explaining:

> [a] defendant may be deemed to have made a constitutional objection if his objection invokes *Apprendi*. A defendant may also be deemed to have made a constitutional objection if he contends that "the issue of drug quantity should go to the jury." Other potential constitutional objections include that an element of the offense was not proved, that the judge cannot determine quantity, or that quantity must be proved beyond a reasonable doubt (and not by a preponderance of the evidence). However, a defendant's objection to the quantity of drugs that the Government attributes to him is not, on its own, a constitutional objection. Such an objection is properly characterized as either an *evidentiary objection* or a *sufficiency of the evidence* objection.

*Id.* at 1303 (internal citations omitted).

Applying *Candelario*'s reasoning to the instant case, the Court finds that Triana's objection to the "harshness" of the Guidelines during his sentencing hearing constitutes a timely constitutional objection. First, though the Supreme Court had not yet decided *Booker* when Triana was sentenced, Triana's counsel referenced the case. Despite the fact that the area of law was unsettled at the time of Triana's sentencing, such a reference certainly put the district court on notice that Triana's counsel objected to the constitutionality of Triana's sentence. Second, both before and during sentencing, Triana's counsel made several evidentiary objections, concerning, for instance, the four-level enhancement the government suggested for Triana's role in the Footcare/Podiatry Admin. conspiracy and claiming that the evidence adduced at trial did not amount to a showing that Triana was "in control" of the scheme. Triana's *Booker* objection, however, can be viewed as distinct from these

other objections because instead of taking issue with factual interpretations, it raised the broader constitutional question of whether Triana's Guideline sentence was disproportionate to the crime, i.e. "harsher" than he deserved.

Additionally, this Court finds Triana's objections to the district court's sentencing calculation of the amount of loss caused by his fraudulent activity sufficient to constitute a constitutional objection. *See supra* Part II.A. ("Loss Calculation"); *Akpan*, 407 F.3d 360; *United States v. Kirkham*, 129 Fed. Appx. 61 (5th Cir. Apr. 11, 2005). Like the case sub judice, both *Akpan* and *Kirkham* are cases in which defendants appealed their respective health care fraud convictions. *Id*. Both the Eighth and the Fifth Circuits found that a defendant's objection to the district court's sentencing calculation of the amount of loss caused by his fraudulent activity raised during his sentencing hearing, effectively preserved his *Booker* objection for appeal. *Akpan*, 407 F.3d at 376 ("we are satisfied that [defendant's] objections adequately apprised the district court that [defendant] was raising a Sixth Amendment objection to the loss calculation . . ."); *Kirkham*, 129 Fed. Appx. at 76-77 ("we hold - and the government concedes - that objections made by defendants at their sentencing hearings [regarding the district court's loss calculations] were sufficient to invoke their Sixth Amendment rights to the extent necessary to preserve their *Booker* objections"). Accordingly, in this case, where Triana raised objections to the loss calculation applied by the district court both pre-sentencing, and during sentencing, this Court joins the Fifth and Eighth Circuits in holding that these objections effectively preserved his *Booker* objection for appeal. *See supra* Part II.B. ("Loss Calculation").

In cases applying preserved error review, this Court applies a *de novo* standard of review to determine whether the district court, viewing the Guidelines as mandatory rather than advisory, sentenced a defendant in violation of *Booker*. *See* 125 S. Ct. at 747. Although the constitutional infirmity of the Guidelines was not settled at the time Triana was sentenced, both parties agree that in light of *Booker*, the district court erred by adopting the Guidelines as mandatory.

If on *de novo* review, an appellate court finds a constitutional error, it is also subject to a "harmless error" analysis under FED. R. CRIM. P. 52(a).[14] The Supreme Court has explained that a constitutional error, such as a *Booker* error, must be disregarded as not "affect[ing] substantial rights," if that error is "harmless beyond a reasonable doubt." *See Chapman v. California*, 368 U.S. 18, 24 (1967). The foregoing standard is only met, however, where it is clear "beyond a reasonable doubt hat the error complained of did *not* contribute to the verdict obtained." *Id*. (emphasis added). In Triana's case, it is clear that the district court's application of the Guidelines enhanced his sentence significantly. Accordingly, this Court **VACATES** Triana's sentence and **REMANDS** his case for resentencing pursuant to *Booker* and its progeny, and also according to the sentencing goals outlined in 18 U.S.C. § 3553(a).

### III. CONCLUSION AND RECOMMENDATION

Accordingly, this Court **AFFIRMS** Defendant's conviction, and finds that the district court correctly held that Triana's actions resulted in a "loss" to Medicare. Because, however, the sentence imposed by the district court violated Triana's Sixth Amendment right to a jury trial, we hereby **VACATE** Triana's sentence and **REMAND** the case for re-sentencing in light of this opinion and the Supreme Court's holding in *Booker*.

**IT IS SO ORDERED.**

---

[14] FED. R. CRIM. P. 52(a) reads: "Any error, defect, irregularity or variance which does not affect *substantial rights* shall be disregarded." (emphasis added).

---

**CONCURRENCE**

---

RYAN, Circuit Judge, concurring. I concur in my brother's opinion, except with respect to part II.C. The government concedes that, even under plain error review, this case should be remanded for resentencing pursuant to *United States v. Booker*, 543 U.S. 220 (2005), and we agree. Therefore, I do not think it is necessary to address whether Triana's objections at sentencing preserved his claim that the district court's fact finding, which resulted in an enhanced sentence under the mandatory guidelines, violated Triana's constitutional rights under the Sixth Amendment.