NOT RECOMMENDED FOR PUBLICATION
File Name: 07a0502n.06
Filed: July 18, 2007

Nos. 06-1333, 06-1494

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| RICHARD BURLEY and | ) | EASTERN DISTRICT OF MICHIGAN |
| TIMOTHY PIERRE CLARK, | ) | |
| | ) | |
| Defendants-Appellants. | ) | OPINION |
| | ) | |

**Before: NORRIS, GILMAN, and SUTTON, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** Richard Burley and Timothy Pierre Clark appeal from their sentences in this bank-fraud case. Both defendants entered guilty pleas to an indictment that charged each of them with aiding and abetting bank fraud, and with conspiracy to commit bank fraud, for their roles in a counterfeit check-cashing scheme. Despite their guilty pleas, neither defendant admitted any of the government's allegations relating to the sentencing enhancements or the amount of loss attributable to their fraudulent activity. The district court imposed a 4-level enhancement on each defendant for his leadership role in the offense, a 16-level enhancement for a loss amount in excess of one million dollars, and a 2-level enhancement for the use of device-making equipment in the scheme.

On appeal, the defendants challenge the application of these sentencing enhancements and the reasonableness of their sentences. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Burley and Clark each were charged in a two-count indictment with aiding and abetting bank fraud, in violation of 18 U.S.C. §§ 1344 & 2 (Count 1), and with conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344 & 371 (Count 2). The indictment addressed an alleged counterfeit check-cashing scheme that operated from approximately July of 1997 until April of 2004. Specifically, the indictment alleged that Burley and Clark had obtained stolen checks from a cooperating bank employee, printed counterfeit checks that matched the legitimate personal and business accounts associated with the stolen checks, and then each distributed the counterfeit checks to his own cadre of at least six coconspirators for cashing at various banks and businesses. The indictment alleged that 462 bank accounts at nine financial institutions were defrauded in the total amount of $1,779,966.10. Under the then-applicable Department of Justice policy, the indictment contained language that set out the elements of sentencing enhancements for the defendants' role in the offense, the amount of loss, and the use of device-making equipment in the offense.

Both Burley and Clark entered guilty pleas to the indictment in September of 2005 without the benefit of a Rule 11 written plea agreement. The defendants, however, did not concede the amount of loss or the applicability of any other sentencing enhancement. But Burley admitted before the district court that he had knowingly provided false identification documents and stolen checks

to coconspirators, and that he had used such items himself to obtain money from at least seven of the nine financial institutions listed in the indictment. His participation in the scheme lasted from late 1999 until "around 2004."

Clark, in turn, admitted that he knowingly purchased fraudulent checks from a friend named "Dave," and that he had used the checks, along with false identification cards that he also knowingly purchased, to buy merchandise from local retail stores. He engaged in this conduct from "somewhere around August 2000 until November or December" of 2004. Others were involved in the scheme, but Clark denied that he ever personally received cash in exchange for a fraudulent check. He admitted, however, that he knew that the checks were produced with computer equipment. The government acknowledged that the defendants had reserved their right to object to whatever amount of loss that the government calculated and to any applicable sentencing enhancements.

According to the government, Khary Lawson and Theodore Washington were among the coconspirators involved with Burley and Clark in the check counterfeiting and cashing operation. Lawson, who worked as a check sorter-operator at Comerica Bank in Detroit, was allegedly approached by Burley in the year 2000 about stealing checks from the bank. Burley offered to pay Lawson approximately $60 for each stolen check. Lawson initially gave the stolen checks to Burley, but later also gave them to Clark.

Sometime in late 2001, Lawson learned from Burley that the stolen checks were being scanned into a computer and that counterfeit checks were being printed. Burley and Clark then began to pay Lawson a portion of the proceeds from the counterfeit checks that they or their "crews"

of check-cashers were able to successfully cash. The government alleged that Burley and Clark each ran a crew of at least six people who cashed the counterfeit checks. Crew members received 10 checks per day, for a total of 120 counterfeit checks daily. The check-cashing operation allegedly operated six days per week.

Following law enforcement raids on the locations where Burley and Clark had been making the counterfeit checks, Burley allegedly approached Washington in November of 2002 about renting a room in Washington's duplex. Washington agreed, and Burley and Clark then set up their computer, scanner, printer, and other identification-making equipment in the rented room, using the machines to make and print counterfeit checks.

Both Lawson and Washington accepted Rule 11 plea agreements after they were eventually arrested and charged as part of the scheme. Lawson was convicted of aiding and abetting bank fraud, sentenced to 12 months of home confinement followed by five years of supervised release, found responsible for an amount of loss of $1,779,996.10, and ordered to make restitution in that amount. Washington was also convicted of aiding and abetting bank fraud, sentenced to six months of home confinement, followed by six months in the Community Correction Center and five years of supervised release, found responsible for an amount of loss of $364,459.18, and ordered to make restitution in that amount.

The district court held a joint sentencing hearing for Burley and Clark in December of 2005. Presentence Reports (PSRs) had been prepared for both of them, calculating each defendant's offense level at 26 with a criminal history category of IV. At the sentencing hearing, the government acknowledged that it bore the burden of proving both the amount of loss and the applicability of the

sentence enhancements by a preponderance of the evidence. The government presented the testimony of Todd Gilevich, a Special Agent with the Secret Service who was in charge of the case. Further testimony came from Lajoy Hughes, Lamarr Jones, Frank Smith, and Theodore Washington, all of whom had participated in the check-cashing scheme.

Gilevich testified about the loss amount that resulted from the scheme. He referred to a spreadsheet prepared by a member of the Detroit Metro Identity Fraud Task Force, a joint federal, state, and local operation that investigated identity-fraud cases in the Detroit area during the time that the defendants were pursuing their scheme. The spreadsheet calculated loss data based on the period of time that Lawson was employed by Comerica Bank, witness testimony, account information, and other evidence gathered during the investigation. Listed on the spreadsheet are all of the checks allegedly passed during the conspiracy, including the account name, the fraudulent payee, the suspected check-casher, and the affected bank.

Gilevich conceded that Clark's name did not appear anywhere on the spreadsheet, but said that he was aware of at least 12 checks cashed by Clark, each in the range of $100 to $200, for a total of no more than $2,000. In contrast, the spreadsheet identified Burley as the suspected casher of numerous checks at three of the banks affected. He was linked to checks in the total amount of approximately $80,000.

Gilevich also testified about the history of the investigation into the check-cashing scheme. A suspect named Orlando Marshall was interviewed about the scheme while under arrest in August of 2001. Marshall did not identify Burley as one of the primary people involved, but instead recounted that he had met Clark in 1998 and began cashing checks for him later that year. Clark,

however, was incarcerated beginning in September of 2000. While Clark was in prison, Marshall began to print his own counterfeit checks. Marshall died in late 2001 or early 2002, prior to any of the indictments in the present case.

Lamarr Jones was another witness at the sentencing hearing. Jones had been a check-casher in the scheme but, because he agreed to testify, was not indicted. According to Jones, he began cashing checks in approximately 2002 to pay back $3,000 that he had stolen from Burley in 2000. Jones recounted that he saw Burley use the computer equipment at Washington's duplex to make and print counterfeit checks, but that he saw Burley print only three to six checks. Although Jones was able to describe the process of making a counterfeit check, he denied that he had ever used the computer equipment or made his own checks.

Lajoy Hughes, who had children by Jones and had formerly been engaged to him, testified at the hearing that she knew that Jones was cashing counterfeit checks. Hughes was Orlando Marshall's sister. She denied ever cashing checks herself or giving checks to Jones to cash, but admitted driving Jones to banks where he cashed fraudulent checks. Although she claimed to have heard Burley and Lawson discussing checks in approximately 1998 or 1999, she denied seeing any checks at that time. She also said that she had seen Burley making counterfeit checks in Washington's duplex, although she admitted that she had been told not to come inside the house.

Frank Smith came to the sentencing hearing as part of a plea agreement in a separate bank-fraud case. Smith had previously testified before a Grand Jury regarding the check-cashing scheme in question, but had failed to disclose his full criminal history in that testimony. At the sentencing hearing, Smith said that he cashed checks for Clark. He also admitted knowing Burley. But he

stated that he never cashed checks for Burley, never saw Burley cash a check, and never heard Burley discuss checks.

Finally, Washington testified at the hearing that Burley approached him in November of 2002 and asked to rent space for some computer equipment. He described using the computer equipment to make false identification cards for both Jones and Hughes, knowing that the cards would be employed in cashing checks. In addition, Washington said that he had seen Burley and Clark make counterfeit checks at his house on multiple occasions, and that he saw Jones make and print counterfeit checks more than 25 times. He also had seen Hughes in the house with Jones, but stated that whenever Burley was there, she stayed outside.

Following the sentencing hearing, the district court issued a written opinion containing its findings regarding the amount of loss and the applicability of the sentencing enhancements. Relying on both the hearing testimony and on the grand jury testimony of Hughes, Jones, and Smith, the court determined that three sentencing enhancements applied to the defendants. The court attributed almost the entire loss amount set forth in the PSRs to each defendant, finding that Clark was responsible for a loss amount of $1,683,587.72 and that Burley was responsible for a loss amount of $1,779,966.10. Because Clark had been incarcerated for approximately six months between 1999 and 2000, the court held him responsible for a lesser loss amount. The court's finding subjected both Burley and Clark to a 16-level enhancement based on a loss amount in excess of one million dollars. In addition, the court decided that both defendants were subject to a four-level enhancement for playing a leadership role in the scheme and a two-level enhancement for using device-making equipment to prepare the counterfeit checks.

In sentencing memoranda, both Burley and Clark objected to the PSRs' calculation of the amount of loss and to the sentencing enhancements. They renewed those objections, which the district court overruled, at the sentencing hearing. Clark was sentenced to 110 months of imprisonment on the count of aiding and abetting bank fraud, a concurrent term of 60 months' imprisonment on the conspiracy count, and a three-year term of supervised release. He was also ordered to make restitution in the amount of $1,683,587.72. Burley was sentenced to a term of 92 months of imprisonment on the count of aiding and abetting bank fraud, a concurrent term of 60 months' imprisonment on the conspiracy charge, and a three-year term of supervised release. He was also ordered to make restitution in the amount of $1,779,996.10.

On appeal, the defendants argue that their Sixth Amendment rights were violated when the district court increased their sentences based on facts not admitted at the plea hearing or proved beyond a reasonable doubt. They also contend that the district court erred in finding that they were responsible for a loss amount greater than one million dollars under U.S.S.G. § 2B1.1(b)(1)(I) and in finding that they were leaders in the scheme under U.S.S.G. § 3B1.1(a). Finally, they assert that the sentences imposed were both procedurally and substantively unreasonable.

## II. ANALYSIS

### A. Factual findings by the sentencing court

Burley and Clark both contend that the district court violated their Sixth Amendment rights in making factual findings by a preponderance of the evidence when it determined the amount of loss, the role that they played in the offense, and that they used device-making equipment. Instead,

they assert that *United States v. Booker*, 543 U.S. 220 (2005), requires the district court to use the beyond-a-reasonable-doubt standard when making factual findings that will increase the sentence beyond the Guidelines range indicated without such additional facts.

This court has rejected the defendants' argument in previous cases, holding instead that "*Booker* did not eliminate judicial fact-finding." *United States v. Coffee*, 434 F.3d 887, 898 (6th Cir. 2006). Our caselaw makes clear "that a district court may make its own factual findings regarding relevant sentencing factors, and consider those factors in determining a defendant's sentence." *United States v. Gardiner*, 463 F.3d 445, 461 (6th Cir. 2006). Moreover, "the district court does not violate *Booker* if it considered the guidelines to be advisory and not mandatory." *United States v. Kosinski*, 480 F.3d 769, 775 (6th Cir. 2007) (brackets omitted). Under the post-*Booker* advisory Guidelines regime, a sentencing enhancement that is based on reliable information, supported by a preponderance of the evidence, and does not exceed the statutory maximum sentence for the offense is constitutional. *Id.*

The district court in the present case conducted an extensive sentencing hearing at which five witnesses testified. It also reviewed the parties' sentencing memoranda, the amount-of-loss spreadsheet, the grand jury transcripts, law enforcement reports, and the PSRs to make its factual findings. *See United States v. Ferguson*, 456 F.3d 660, 665 (6th Cir. 2006) (finding a district court's sentencing determination appropriate where it held a sentencing hearing and relied on the PSR in determining the facts used to calculate the Guidelines range). The district court also described the Guidelines range as "*a factor* for the Court to look to in deciding what . . . a proportionate sentence should be." (Emphasis added.) Thus, in keeping with this court's post-*Booker* caselaw, we conclude

that the district court acted within its authority in finding the facts used to calculate Burley's and

Clark's Guidelines ranges.

**B.** **Sentencing enhancements**

**1.** *Leadership roles*

Burley and Clark contend that the district court clearly erred in finding that they were leaders

or organizers in the check-cashing scheme. Under the Guidelines, a sentencing court must increase

a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal

activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a).

"An upward departure may be warranted . . . in the case of a defendant who did not organize [or]

lead . . . another participant, but who nevertheless exercised management responsibility over the

property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1 cmt. n.2. The

government bears the burden of establishing the factors supporting the enhancement by a

preponderance of the evidence. *United States v. Barton*, 455 F.3d 649, 658 (6th Cir. 2006) (holding

that *Booker* did not change the burden of proof for enhancements).

Under the caselaw of this circuit, the standard of review for a district court's application of

§ 3B1.1(a) is unsettled. *See, e.g.*, *United States v. Milan*, No. 05-6209, 2007 WL 627870, at *3 (6th

Cir. Mar. 2, 2007) (upholding the application of a § 3B1.1(a) enhancement under both deferential

and de novo review); *see also United States v. McDaniel*, 398 F.3d 540, 551 & n.10 (6th Cir. 2005)

(declining to resolve the question of the applicable standard of review). This court has traditionally

"reviewed the district court's factual findings for clear error and its legal conclusions de novo."

*McDaniel*, 398 F.3d at 551 n.10. In *Buford v. United States*, 532 U.S. 59, 66 (2001), however, the

- 10 -

Supreme Court ruled that "in light of the fact-bound nature of the legal decision," an appellate court should review deferentially a district court's application of § 4B1.2 (the crime-of-violence enhancement). This court has thus "reserve[d] judgment as to whether the district court's application of § 3B1.1 . . . should be reviewed deferentially or de novo." *United States v. Henley*, 360 F.3d 509, 516 (6th Cir. 2004); *see also Milan*, No. 05-6209, 2007 WL 627870, at *3 (same). For the reasons set forth below, we again have no need to resolve this issue in the present case.

Burley and Clark both objected in the district court to the application of the leadership enhancement. In applying the § 3B1.1(a) enhancement to the defendants, however, the district court found that the evidence was more than sufficient to identify Burley and Clark as leaders in the check-cashing scheme under the preponderance standard.

With reference to Clark, the district court noted "the large amount of money, the number of people" involved in the scheme, "the planning that had to take place" in organizing the scheme, "and the history of similar kinds of offenses committed by Mr. Clark over the years" as support for applying the § 3B1.1(a) enhancement. It also characterized Clark as "the real brains obviously behind the operation."

With reference to Burley, the district court stated that although "it might not be fair to characterize Mr. Burley as the brains behind the operation, . . . he did a lot of heavy lifting." The court found that "the main distinction . . . between the activities of Mr. Clark and Mr. Burley compared to some of the others who have been prosecuted . . . is just that the level of activity in relation to this fraud was so much greater." Specifically, Burley "participated in the recruitment obviously of a number of people including Mr. Lawson," "leased the premises for Mr. Clark where

the equipment was maintained," "participated in the operation of the equipment," and "had his own group of runners."

Burley disputes the credibility of the witnesses, including Hughes, Jones, and Smith, who identified him as having between five and seven people working in his check-cashing "crew." But even if we were to assume for the sake of argument that the district court erred in relying on the testimony of Hughes, Jones, and Smith, there was still sufficient evidence in the record to support a finding that Burley "exercised management responsibility over the property, assets, or activities" of the scheme, U.S.S.G. § 3B1.1(a), cmt. 2, because Burley does not dispute that he rented space from Washington for the computer equipment or that he made and printed counterfeit checks.

Based on the evidence considered by the district court in both its written opinion and at the February 27, 2006 sentencing hearing, the district court concluded that the defendants were organizers or leaders under U.S.S.G. § 3B1.1(a). We find no error in that determination even under the de novo standard of review, and would obviously reach the same conclusion under a more deferential standard.

### 2. *Amount of loss*

Burley and Clark next contend that the district court erred when it found them each to be responsible for a loss amount in excess of one million dollars, resulting in a 16-level sentencing enhancement under U.S.S.G. § 2B1.1(b)(1)(I). "Under the Guidelines, the district court is to determine the amount of loss by a preponderance of the evidence, and the district court's findings are not to be overturned unless they are clearly erroneous." *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006). But "whether those facts as determined by the district court warrant the

application of a particular guideline provision is purely a legal question and is reviewed de novo by this court." *Id.*

The comments to U.S.S.G. § 2B1.1(b) set forth the general rule that "loss is the greater of actual loss or intended loss," where "actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* at cmt. 3(A)(i). "[R]easonably foreseeable pecuniary harm means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* at cmt. 3(A)(iv). The commentary to § 2B1.1 also explains that the district court "need only make a reasonable estimate of the loss . . . based on available information." *Id.* at cmt. 3(C). Both Burley's and Clark's respective PSRs recommended applying a 16-level enhancement because the actual loss was more than $1,000,000 but less than $2,500,000.

Burley contends that the district court simply adopted the findings of his PSR as to the amount of loss without making an independent finding of fact. This was erroneous, according to Burley, because "the PSR cannot be substituted for a ruling on a disputed matter." *See United States v. Darwich*, 337 F.3d 645, 667 (6th Cir. 2003). But Burley concedes that the district court referred to additional material beyond the PSR in making its amount-of-loss determination.

Burley particularly disputes the finding that he managed a check-cashing crew. He instead characterizes the evidence as establishing "that there were separate, distinct, and independent groups of individuals that manufactured checks, passed them at institutions and stores, and distributed the proceeds among [each] group exclusively." Burley further contends that Agent Gilevich's testimony established that the spreadsheet identified Burley only as a suspected check-casher for approximately $80,000 worth of checks from three of the nine banks involved. Accordingly, Burley argues that

none of the other losses can be attributed to him because "the full scope of the conspiratorial activities were both unknown and unfor[e]seen" by him. But both his PSR and the witness testimony identified Burley as the person who recruited Lawson to steal legitimate checks, who rented space for the computer equipment from Washington, and as one of the people who printed and distributed counterfeit checks to a check-cashing crew. His argument on this ground therefore fails.

Clark, on the other hand, argues that the district court erred in finding him responsible for over one million dollars in loss because the loss amount did not "reflect economic reality." He contends that Gilevich's testimony constituted the only "direct and uncontested evidence on the amount of loss," and that this testimony established that Clark was responsible for only $2,000 of loss. As with Burley, however, ample evidence in the record indicates that Clark was responsible for a substantially greater amount of loss. Lawson's plea agreement stated that he gave stolen checks to Clark, who then used them to create counterfeit checks. The law enforcement investigative reports reveal that Clark had multiple individuals working for him as check-cashers. Testimony also established that Clark had been making counterfeit checks for a period of more than five years. We therefore conclude that the district court did not err in calculating the amount of loss as to each defendant in accordance with Agent Gilevich's spreadsheet.

### 3. *Device-making equipment*

Burley and Clark further contend that the district court erred when it applied a two-level enhancement to their Guidelines sentences for the use of device-making equipment under U.S.S.G. § 2B1.1(b)(10)(1). The government argues that the defendants have abandoned this claim, noting

that Clark specifically conceded that there was sufficient evidence to support the device-making-equipment enhancement as set forth in his PSR.

Burley, for his part, simply states in conclusory fashion that "there was insufficient reliable information provided" to the district court to support this enhancement. The record contains evidence, however, that Burley rented space from Washington for the computer equipment, and that Jones and Hughes saw Burley using computer equipment to make and print counterfeit checks. Issues such as this that are presented in a "perfunctory manner, unaccompanied by some effort at developed argumentation," are deemed waived. *See United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999). We therefore conclude that the defendants have abandoned their challenge to the U.S.S.G. § 2B1.1(b)(10)(1) enhancement.

## C.     Reasonableness review

Finally, Burley and Clark contend that their sentences are unreasonable. As a preliminary matter, a sentence within the advisory Sentencing Guidelines range is deemed presumptively reasonable. *Rita v. United States*, ___ S. Ct. ___, 2007 WL 1772146, *8-9 (June 21, 2007) (holding that a federal appellate court may apply a nonbinding presumption of reasonableness to a within-Guidelines sentence). A district court, however, must also consider the factors listed in 18 U.S.C. § 3553(a) before imposing a sentence. *United States v. Williams*, 436 F.3d 707, 708 (6th Cir. 2006). The court must then "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in § 3553(a). *United States v. Foreman*, 436 F.3d 638, 644 (6th Cir. 2006) (quoting 18 U.S.C. § 3553(a)(2)). In addition, district courts are directed to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the need to

avoid unwarranted sentencing disparities between defendants who have similar records and have been found guilty of similar conduct, and the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a)(1)-(7). But the district court is not required to engage in a "ritual incantation" of the various factors. *United States v. Johnson*, 403 F.3d 813, 816 (6th Cir. 2005).

Reasonableness review encompasses "both substantive and procedural components." *United States v. Jones*, 445 F.3d 865, 869 (6th Cir. 2006). Procedural unreasonableness occurs where "the district judge fails to consider the applicable Guidelines range or neglects to consider the other factors listed in 18 U.S.C. § 3553(a)," but rather "selects what the judge deems an appropriate sentence." *Ferguson*, 456 F.3d at 664 (citations and quotation marks omitted). Substantive unreasonableness occurs where the district court "selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors, or gives an unreasonable amount of weight to any pertinent factor." *Id.* (citations and brackets omitted). *But see United States v. Bailey*, __ F.3d __, __, 2007 WL 1713327, at *6 n.1 (6th Cir. June 15, 2007) (discussing the distinction between substantive and procedural reasonableness and noting (1) that "[i]n many ways, the procedural and substantive components, as delineated by *Ferguson* and subsequent cases, appear to overlap" and (2) that our cases have not treated the issue consistently).

Both defendants raise concerns about the very significant disparity between the sentences imposed on them and the sentences imposed on Lawson and Washington. As previously noted, the Guidelines range for Lawson was 41 to 51 months' incarceration, but he was sentenced to 12 months of home confinement. Washington's plea agreement calculated his Guidelines range as 27 to 33

months' incarceration, but he was sentenced to 6 months in a community corrections center with 6 months of home confinement to follow.

The government noted that both Lawson and Washington cooperated with the prosecution and accordingly received motions for downward departure pursuant to U.S.S.G. § 5K1.1. Even so, the government still sought 33 to 41 months' imprisonment for Lawson and 22 to 26 months' imprisonment for Washington. At oral argument, the government conceded that it did not appeal from either Lawson's or Washington's sentences, although it had the right to do so. We find the relatively light sentences received by Lawson and Washington puzzling, but the reasonableness of their sentences are not before us. What is before us are the sentences of Burley and Clark, and we find neither to be unreasonable for the reasons set forth below.

### 1.      *Richard Burley*

The district court calculated Burley's applicable Guidelines range as between 92 and 115 months of imprisonment. Because the court imposed a sentence of 92 months, that sentence carries a presumption of reasonableness. *See Rita*, 2007 WL 1772146, at *8-9. But sentencing a defendant to a within-Guidelines term of imprisonment does not relieve the district court of its responsibility to explain its reasons for imposing that sentence. *United States v. Richardson*, 437 F.3d 550, 554 (6th Cir. 2006). A defendant is entitled to resentencing if the district court simply provides a list of the defendant's characteristics "without any accompanying analysis." *United States v. Jackson*, 408 F.3d 301, 305 (6th Cir. 2005) (vacating a sentence as unreasonable for lack of any analysis).

In sentencing Burley, however, the district court considered his PSR, the evidence from the sentencing hearings, argument from both the government and from Burley's counsel, a statement by

Burley himself, and the Sentencing Guidelines. Burley argues in response that the PSR overrepresents his criminal history, that he was a latecomer to the scheme and not the "mastermind," and that he took responsibility for his conduct by entering a guilty plea in a timely fashion. Accordingly, Burley contended that a downward variance from the Guidelines range would be appropriate.

The district court sought clarification from counsel and the Probation Department on how Burley's criminal history category was calculated. After a discussion, the court stated that the similarity of Burley's previous criminal activity did not "diminish[] his involvement in the criminal offense," and concluded that "the guideline range . . . fairly account[s] for the sentence that would be proportionate[] and just." The court found that Burley might not have been "the brains behind the operation," but noted that his "level of activity in relation to this fraud was so much greater" than some of the other coconspirators. Burley, the district court emphasized, had "many, many opportunities along the line . . . to drop out of the ongoing criminal activity," but did not do so. Accordingly, the court concluded that the Guidelines range of 92 to 115 months "responds to the magnitude of the offense and the need for deterrence" of both Burley and of others. Satisfied that the PSR's recommendation was correct, the court then imposed a sentence of 92 months, at the low end of the applicable range.

We conclude that Burley's sentence satisfies the standard for reasonableness. The district court was aware that the Guidelines are only advisory and it adequately accounted for the § 3553(a) factors. Although the court could have perhaps done more in analyzing the factors in relation to this particular defendant and in linking Burley with the sentence imposed, we conclude that it sufficiently

explained the basis for its ruling. *See Rita*, 2007 WL 1772146, at *12 ("[W]hen a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation."); *id.* at *13 ("Where a matter is as conceptually simple as in the case at hand and the record makes clear that the sentencing judge considered the evidence and arguments, we do not believe the law requires the judge to write more extensively.").

### 2.      *Timothy Pierre Clark*

The district court calculated Clark's applicable Guidelines range as between 110 and 137 months of imprisonment. He was sentenced to 110 months, which carries a presumption of reasonableness because it is within the Guidelines range. *See Rita*, 2007 WL 1772146, at *8-9. Clark asked for leniency on the ground that others who were, in his words, "equally, if not[] more culpable to him" had been sentenced far below their Guidelines range. He specifically focused on Lawson, who received a sentence of 12 months' home confinement despite having a Guidelines range of 41 to 51 months of imprisonment.

The district court rejected this request, distinguishing Lawson's conduct because "it didn't require a whole lot of him to take the checks and turn them over to Mr. Clark and Mr. Burley." Instead, the court concluded that Clark was "[t]he real brains behind the operation." Clark was responsible for planning the scheme, acquiring the counterfeiting equipment, and recruiting check-cashers. The court further noted that "the sentencing direction that the Court has is to treat these folks individually and to focus on a sentence that's proportionate to the violation and the violator." After noting the large amount of loss, the number of people involved in the offense, the planning required for the scheme, and Clark's history of convictions for similar types of offenses,

the court determined that "the guideline range is a range that the Court should look to in imposing a sentence." Clark's criminal history, the court noted, also indicated that he had not learned from his past convictions.

As with Burley's sentence, we conclude that Clark's sentence also meets the standard for reasonableness. The district court was "aware that [the] ultimate sentencing authority rested with the sentencing court, not the guidelines[,]" and adequately accounted for the § 3553(a) factors. *United States v. Mickens*, 453 F.3d 668, 673 (6th Cir. 2006). Although the court again could have perhaps done more in analyzing the factors in relation to this particular defendant and in linking Clark with the sentence imposed, we conclude that it sufficiently explained the basis for its ruling.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.